In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3307

United States of America,

Plaintiff-Appellee,

v.

Louis J. Wesela,

Defendant-Appellant.


Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 99-CR-24--Rudolph T. Randa, Judge.


Argued January 18, 2000--Decided August 3, 2000


Before Easterbrook, Kanne, and Diane P. Wood, Circuit Judges.

Diane P. Wood, Circuit Judge.

I

At approximately 1:15 a.m. on Tuesday, January 26, 1999, the Milwaukee Police Department received a 911 call from Mrs. Elizabeth Wesela. She told the operator that her husband, Louis Wesela, had a gun, had been threatening to kill her, and had shot and killed a family cat. Mrs. Wesela reported that her husband had fallen asleep, and she asked the police to come to her home.

When the police arrived, Mrs. Wesela admitted them to the couple's apartment. The officers asked where the man with the gun was; Mrs. Wesela responded that he was in the bedroom, and she volunteered that the gun was next to him on the bed. The police found Louis Wesela laying on the bed in the bedroom. After getting him up, the police ordered him out of the room and placed him under arrest. One officer then searched the bedroom for the gun and found it on a table under a pile of clothes. While in the bedroom, the officer noticed a pair of white tennis shoes stained with a drop of blood as well as a blood stain on the carpet. The officer then looked

under the bed and saw cat feces against the wall. After the bedroom search, Wesela was taken to the hospital for medical treatment.

Detectives Schmitz and Corbett arrived at the Wesela home at 2:15 a.m. After a uniformed police officer briefed them, Detective Schmitz interviewed Mrs. Wesela in the apartment's living room. During the half-hour interview, Mrs. Wesela explained that she and her husband had been arguing since Sunday (January 24, 1999). She told Detective Schmitz that her husband had threatened to kill her. During the argument, he had behaved violently: he confronted an upstairs neighbor with the gun, shot the gun into the ceiling, and shot and killed one of the family's cats. Mrs. Wesela explained that he threw the dead cat in the garbage container behind the apartment building. After preparing himself a drink, Wesela went to sleep at around 10:00 p.m. Mrs. Wesela waited in the living room until she was certain he was sleeping. She then called the police.

As Detective Schmitz spoke with Mrs. Wesela, Detective Corbett went about collecting evidence. He did not ask Mrs. Wesela for permission to conduct the search, but Mrs. Wesela did not object to what he was doing. A uniformed police officer directed the detective to the evidence that had been discovered prior to the detectives' arrival. Detective Corbett found the dead cat in the outside garbage bin as Mrs. Wesela had reported and observed a trail of blood leading from the container to the apartment's back door. He also located a bullet hole in the ceiling and noted the location of the gun, ammunition, and blood stain in the bedroom. Detective Corbett also found an uncovered cardboard box in the bedroom, with books, paperwork, and a box for a Taurus .22 revolver inside. While searching the bedroom, Detective Corbett overheard Mrs. Wesela describe how her husband shot the cat while it was underneath the bed. Detective Corbett then looked under the bed, moved it away from the wall, and found a bullethole in the baseboard where the cat had been shot. He removed the bullet.

After a trial, Wesela was convicted of being a felon in possession of a firearm in violation of 18 U.S.C. sec.sec. 922(g), 924(e). The only issue disputed at trial was Wesela's possession of the firearm, as the parties stipulated that Wesela had previously been convicted of a felony. Wesela raises several issues in this appeal. Because any errors made were harmless in the face of the overwhelming evidence, we affirm Wesela's conviction.

II

## A. Constitutionality of the Felon in Possession Statute

Wesela first argues that one of the statutes under which he was convicted, 18 U.S.C. sec. 922(g), is unconstitutional because it exceeds Congress's powers under the Commerce Clause. We have already rejected this with respect to sec. 922(g). See United States v. Williams, 128 F.3d 1128 (7th Cir. 1997). Williams distinguished sec. 922(g) from the statute the Supreme Court considered in United States v. Lopez, 514 U.S. 549 (1995), on the ground that sec. 922(g), unlike the Lopez statute (18 U.S.C. sec. 922(q)), specifically requires that the possession must be "in or affecting interstate commerce." 128 F.3d at 1133-34. Nothing in United States v. Morrison, 120 S. Ct. 1740 (2000), or in Jones v. United States, 120 S. Ct. 1904 (2000), causes us to think that a different result is now required for sec. 922(g). In Morrison, the Court struck down the Violence Against Women Act, 42 U.S.C. sec. 13981, on the ground that it exceeded Congress's power under the Commerce Clause, but the Court was careful to note that the Act did not contain a jurisdictional element. Morrison, 120 S. Ct. at 1751. In Jones, the Court held that the arson statute, 18 U.S.C. sec. 844(i), covered only arson of property that itself was currently used in interstate commerce or in an activity affecting commerce. Nothing in either case casts doubt on the validity of sec. 922(g), which is a law that specifically requires a link to interstate commerce.

## B. Motion to Suppress

Before trial, Wesela filed a motion to suppress evidence gathered from his apartment and incriminating statements he made following his arrest. The district court denied the motion and allowed all of the evidence in. In reviewing a district court's denial of a motion to suppress, we review findings of historical fact and credibility determinations for clear error. United States v. Johnson, 170 F.3d 708, 712-13 (7th Cir. 1999). We review de novo mixed questions of law and fact such as determinations of probable cause or reasonable suspicion. Id., citing Ornelas v. United States, 517 U.S. 690, 699 (1996).

### 1. Evidence Gathered During Searches

Wesela first contests the legality of the officers' search for his gun immediately following his arrest. His theory is that Mrs.

Wesela allowed the officers to enter her home for one very limited purpose: to arrest him. He contends that Mrs. Wesela did not consent to a search for the gun, or, in the alternative, that even if she impliedly consented to a search for the gun, the officers exceeded the scope of that implied consent. (He concedes that if the search for the gun was permissible, then evidence of the rest of the items discovered during that search, such as the blood-stained tennis shoes, cat feces, and blood stain on the rug, were admissible under the plain view doctrine.) Wesela also contests the admission of evidence related to items found during Detective Corbett's search of the home (the bullet in the baseboard, the gun box, and the shell casings). For the latter search, he argues again that his wife did not give her express consent and, because she was being interviewed by Detective Schmitz while Detective Corbett searched, she could not have impliedly consented either.

Following a hearing on the motion to suppress, Magistrate Judge Gorence made several findings of fact, which the district court adopted in their entirety. The district court, however, drew different legal conclusions from those findings. Both judges agreed that Mrs. Wesela consented to the police entry of her apartment to arrest her husband and to search for the gun. The magistrate judge, who found that the scope of her consent was limited to looking for the gun, would have suppressed the items Detective Corbett found, because Mrs. Wesela never broadened her consent. The district court saw things differently. It concluded that Mrs. Wesela's failure to object constituted general consent to the search, and all evidence discovered by Detective Corbett--the documents in the gun box, the bullet in the baseboard, and the two shell casings deep inside the garbage bag--was admissible.

Under the Fourth Amendment, the standard for measuring the scope of an individual's consent is "objective reasonableness": "what would the typical reasonable person have understood by the exchange between the officer and the [person giving consent]?" Florida v. Jimeno, 500 U.S. 248, 251 (1991). The scope of a search is generally defined by its "expressed object." Id. To determine whether a search was within the boundaries of consent is determined according to the "totality of all the circumstances." United States v. Torres, 32 F.3d 225, 230-31 (7th Cir. 1994).

We agree with the district court that these facts demonstrate Mrs. Wesela's consent to search the apartment for both her husband and the gun. She called the agents for the express purpose of

ridding her house of the threat posed by her (armed) husband, and she allowed the officers to enter her house in order to arrest him. At the suppression hearing, one of the officers testified that she consented to the officers' entering the apartment to secure both the man and the gun. Mrs. Wesela herself told the officers where they could find the gun. The fact that there was no direct verbal exchange between Detective Corbett and Mrs. Wesela in which she explicitly said "it's o.k. with me for you to search the apartment," is immaterial, as the events indicate her implicit consent. Mrs. Wesela was in the living room while the search was going on in the bedroom; the bedroom was not visible from the living room, but Detective Corbett was able to overhear her description of events while he was in the bedroom and she was able to hear and respond to his question about the ownership of the tennis shoes. Due to the proximity of the rooms, Mrs. Wesela was probably aware of what was going on in the bedroom and elsewhere in the apartment. Had she wished to do so, she could have objected to Detective Corbett's search. See United States v. Stribling, 94 F.3d 321, 324 (7th Cir. 1996); Gerald M. v. Conneely, 858 F.2d 378, 884-85 (7th Cir. 1988).

The district court reasonably concluded that Mrs. Wesela at the very least implicitly consented to the search. Had Detective Corbett conducted an all-out search of the Wesela home, perhaps the result would be different. But everything he did was narrowly confined to finding evidence related to the events of that evening: the gun, the bullets, the shell casings, and the dead cat. He did not go through drawers, rummage through closets, or search other rooms of the house in an attempt to find drugs, money, or any other extraneous evidence of other possible illegal activities. Under the circumstances here, the court did not err in denying Wesela's motion to suppress.

2. Post-Arrest Statements

After his arrest, Wesela made two statements to the police that he argues should have been suppressed. He made the first one on the morning of January 26, 1999, during questioning by Detective Corbett. The detective read Wesela his Miranda rights and asked him if he understood them. After responding that he did, Wesela asked, "Could I get a lawyer?" Detective Corbett responded that he could not call one for him.Wesela then stated, "I can't call one either. All right here's what happened." Wesela then described the events leading to his arrest.

Wesela made more incriminating statements on

February 1, 1999, to Special Agent Darin ("SA Darin") of the United States Bureau of Alcohol, Tobacco and Firearms. SA Darin had the job of transporting Wesela to the federal courthouse in Milwaukee for his initial appearance. En route, SA Darin gave Wesela a copy of the criminal complaint and explained federal court procedures to him. Wesela made an unsolicited comment to SA Darin, who responded that he was not going to advise Wesela of his Miranda rights and that he did not want to discuss the facts of the case. Later that day, SA Darin escorted Wesela to a courtroom. As they were waiting outside the courtroom on a bench, Wesela again began talking about the facts of the case. SA Darin again warned Wesela that he did not want to talk about the facts of the case, and he told Wesela that he might have an appointed attorney already. Undeterred, Wesela then described his argument with his wife and (in great detail) why and how he had shot the cat.

Wesela argues that his statements to SA Darin should have been suppressed as fruits of the poisonous tree (the alleged poisonous tree being Detective Corbett's initial statement he could not get a lawyer for him, in lieu of leaving Wesela alone). The first problem Wesela faces is that, under Duckworth v. Eagan, 492 U.S. 195, 201 (1989), there was no poisonous tree here. Detective Corbett's statement was similar to the one the Court found acceptable in Eagan, where the police told the defendant that he had a right to a lawyer, but that they had no way of giving him one. Id. at 198. Furthermore, even if some distinction between this case and Eagan could be found (if, for instance, that particular part of the case were seen as dicta), Wesela's statements were still admissible under Brown v. Illinois, 422 U.S. 590 (1975). Brown identifies a number of factors that help to show whether statements following illegal police conduct are admissible: the voluntariness of the statement, the temporal proximity of the illegal conduct and the confession, the presence of any intervening circumstances, and the purpose and flagrancy of the official misconduct. Id. at 603-04. See also United States v. Patino, 862 F.2d 128, 132 (7th Cir. 1988) (discussing Brown factors). "But if a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." Davis v. United States, 422 U.S. 452, 458 (1981), citing Edwards v. Arizona, 451 U.S. 477, 484-85 (1981).

Wesela's statement to SA Darin is not inadmissible under Brown or Edwards. There can be no doubt that Wesela volunteered his statements

to SA Darin. SA Darin repeatedly informed Wesela that he did not want to talk about the facts of the case. Indeed, we are hard pressed to imagine a more conscientious refusal to take advantage of the situation than SA Darin's. Wesela ignored SA Darin's requests not to speak with him about the case. Instead, he kept talking, eventually incriminating himself by describing how he shot the cat (and thereby essentially admitting he had possession of the gun). Moreover, Wesela's statements to SA Darin were made six days after his interview with Detective Corbett. Six days was a sufficiently long period of time for Wesela to reflect on his predicament, collect his thoughts about his interview with Detective Corbett, and decide whether he wanted to speak with an attorney before making any further statements. The fact that he was in custody during the six intervening days is not dispositive of his case. Cf. Patino, 862 F.2d at 133 (defendant had "complete freedom" in intervening six days). Wesela reinitiated conversation with the police of his own volition; he made the statements voluntarily and they were unrelated to any possible Fifth Amendment violations during earlier questioning. See Davis, 512 U.S. at 458 (stating if suspect requests counsel, questioning must cease "until a lawyer has been made available or the suspect himself reinitiates conversation") (emphasis added), citing Edwards, 451 U.S. at 484-85. The district court did not err in allowing the admission of Wesela's statements to SA Darin.

C.   Statements of Mrs. Wesela

At trial, the government used Detective Schmitz to introduce statements made by Mrs. Wesela during her interview with Detective Schmitz at 2:18 a.m. on January 26, 1999, including her description of the events of January 24 and 25. Detective Schmitz's account of what Mrs. Wesela told her during their conversation was, of course, hearsay. The government offered three bases for admitting the hearsay testimony for its truth: Fed. R. Evid. 803(1) (present sense impression); 803(2) (excited utterance); and 807 (residual or catchall exception for statements having "circumstantial guarantees of trustworthiness"). The district court initially admitted the testimony pursuant to the residual hearsay exception, Rule 807, and reserved the question of admissibility under Rules 803(1) and 803(2). At trial, however, the court also cited Rule 803(2) as justification for its admission. Wesela contests only the admission under Rule 803(2).

We review evidentiary decisions for abuse of

discretion. United States v. Singleton, 125 F.3d 1097, 1106 (7th Cir. 1997)--that is, has the district court done something so far out of line that "no reasonable person could agree" with its rulings. United States v. Sinclair, 74 F.3d 753, 756 (7th Cir. 1996). Rule 803(2) defines an excited utterance as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Fed. R. Evid. 803(2). Hearsay statements are admissible under the excited utterance exception if (1) a startling event occurred; (2) the declarant made the statement while under the stress of excitement caused by the startling event; and (3) the declarant's statement relates to the startling event. United States v. Sowa, 34 F.3d 447, 453 (7th Cir. 1994) (citations omitted). The basis of the exception is that "such statements are given under circumstances that eliminate the possibility of fabrication, coaching, or confabulation." Id. at 452-53, quoting Idaho v. Wright, 497 U.S. 805, 820 (1990). The timing of the statement is important but not controlling. Gross v. Greer, 773 F.2d 116, 119-20 (7th Cir. 1985). "All that the exception requires is 'that the statement be made contemporaneously with the excitement resulting from the event, not necessarily with the event itself.'" Smith v. Fairman, 862 F.2d 630, 636 (7th Cir. 1988), quoting United States v. Moore, 791 F.2d 566, 572 n.4 (7th Cir. 1986).

Wesela argues that it was an abuse of discretion to allow in the statements pertaining to the events of the 24th and the morning of the 25th. He contends that at the time Mrs. Wesela made those statements, she was stressed and excited, but her stress and excitement did not stem from the events that occurred on the 24th and the morning of the 25th; instead, she was agitated because of the events of the evening of the 25th. The court disagreed and found that the events over the 24th and 25th were part of a continuing course of conduct which left Mrs. Wesela in a stressed and excited condition. The court therefore allowed in the statements regarding all of the events.

The government is correct that some courts have found statements following a long lapse in time to fall within the excited utterance exception. However, these cases generally involve young children who are the victims or witnesses of crime. See, e.g., Sowa, 34 F.3d at 449, 453; Gross, 773 F.2d at 120; United States v. Iron Shell, 633 F.2d 77, 85-86 (8th Cir. 1980). In the case of an adult declarant, courts are much less likely to find any statements made to fall within the exception. See, e.g., United States v. Zizzo,

120 F.3d 1338, 1355 (7th Cir. 1997) (finding no excited utterance where startling event took place at O'Hare Airport and statement was made at the Dirksen Building in downtown Chicago).

Several hours passed between the events of the morning of January 24 and 25 and the time Mrs. Wesela spoke to Detective Schmitz. Mrs. Wesela was not under a continuous threat; to the contrary, she was at work and away from Wesela for a full workday. That she was able to go to work demonstrates that she had regained at least some of her composure and emotional control. Therefore, although Wesela engaged in a pattern of threatening behavior, one cannot say that Mrs. Wesela was under continuous, uninterrupted stress and excitement. By accepting a lesser state of mental angst as enough to satisfy Rule 803(2), the district court applied the wrong legal standard. It thus abused its discretion in admitting Mrs. Wesela's statements regarding the 24th and the morning of the 25th.

The error, however, was harmless. Because the parties had stipulated that Wesela was a felon, the only contested issue at trial was whether Wesela possessed a firearm. The evidence seized from the Weselas' apartment (e.g., the dead cat, shell casings, gun, and gun box) combined with SA Darin's testimony regarding Wesela's admission of why and how he shot the cat provided incontrovertible evidence that Wesela possessed the gun. Detective Schmitz's testimony regarding Mrs. Wesela's statements were completely unnecessary to gain Wesela's conviction.

Our finding of harmless error makes it unnecessary as well for us to decide whether Mrs. Wesela's testimony could have been admitted under Rule 807. We note, however, that Sixth Amendment Confrontation Clause problems can arise if evidence from an unavailable witness is used against a defendant. As Justice Stevens put it in Lilly v. Virginia, 527 U.S. 116 (1999), "[w]hen the government seeks to offer a declarant's out-of-court statements against the accused, and, as in this case, the declarant is unavailable, courts must decide whether the Clause permits the government to deny the accused his usual right to force the declarant to submit to cross-examination, the greatest legal engine ever invented for the discovery of truth." Id. at 124, quoting from California v. Green, 399 U.S. 149, 158 (1970) (footnote and internal quotations omitted). These concerns can be overcome only when the evidence "falls within a firmly rooted hearsay exception," or it contains particularized guarantees of truthfulness such that adversarial testing would be expected to add little to its reliability. 527 U.S. at 124-25, reiterating framework from Ohio v. Roberts, 448 U.S. 56, 66

(1980). See also Idaho v. Wright, 497 U.S. at 815.

Here, Mrs. Wesela was arguably unavailable, because it appeared that she might have been prepared to invoke her spousal privilege under Fed. R. Evid. 501. In addition, Rule 807 almost by definition is not a "firmly rooted" or "longstanding exception" to the hearsay rule. To the contrary, it is the "residual" exception--the catchall. Thus, before evidence can come in under that rule there must be equivalent circumstantial guarantees of its trustworthiness. These questions would be worth exploring but for two facts: first, Wesela never argued that his confrontation rights would be violated if Detective Schmitz's hearsay statements about Mrs. Wesela were admitted only under Rule 807, and second, like most errors even of constitutional dimension, this one is subject to harmless error analysis. Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986); Smith, 862 F.2d at 638; see also Arizona v. Fulminante, 499 U.S. 279, 306-07 (1991). The same reasons that persuaded us that the error under Rule 803(2) was harmless are equally compelling here.

III

Wesela stipulated that he had previously been convicted of a felony, and he admitted that he shot the cat with a gun. Finding no error in the district court's suppression rulings, and nothing that amounted to more than harmless error in its evidentiary decisions, this was more than enough to support his conviction, which we Affirm.