# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 02-3965

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MICHAEL E. THOMPSON,

*Defendant-Appellant.*

———————

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 02 CR 35—**Sarah Evans Barker**, *Judge.*

———————

ARGUED NOVEMBER 7, 2003—DECIDED FEBRUARY 23, 2004

———————

Before COFFEY, RIPPLE and KANNE, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Michael Thompson was indicted on
one count of possession of ammunition by a felon, a viola-
tion of 18 U.S.C. § 922(g)(1). During his jury trial, the district
court permitted the prosecution to cross-examine a defense
witness about Mr. Thompson's past acts of physical violence
and threats. Mr. Thompson was convicted and now appeals
this conviction. He submits that the district court's eviden-
tiary ruling was error and that 18 U.S.C. § 922(g)(1) is
unconstitutional. For the reasons set forth in the following
opinion, we affirm the judgment of the district court.

**I**

## BACKGROUND

### A.  Facts

About a week prior to his arrest, Mr. Thompson rented a Dodge Neon automobile from C.J. Auto Sales. Mr. Thompson and Kimberly Shinnamon, with whom Mr. Thompson had a romantic relationship, then drove the rental car throughout southern Indiana. During their travels, both Mr. Thompson and Shinnamon kept shoes, underwear, jackets and other clothing in the car. This trip concluded for Shinnamon on November 20, 2001, when, after an argument between the two, Mr. Thompson drove away in the rental car and left Shinnamon behind. At the time they went their separate ways, their clothing and other belongings remained intermingled within the automobile.

The following day, Mr. Thompson was arrested in Indianapolis pursuant to a warrant charging him with an offense against Shinnamon,[1] which had occurred about a month before. Subsequent to his arrest, Mr. Thompson, while sitting in the back of an ambulance, asked Detective Ronald Gray for a drink of water and a jacket. Mr. Thompson indicated to Detective Gray that the jacket was in the Dodge Neon which Mr. Thompson had been driving. Detective Gray testified that, when he went to retrieve the jacket from the car, he saw only one jacket, a jacket the officer described as a light-green jacket that would fit a person with a medium to large physique. Prior to handing the

---

[1]  Although the details of the warrant are not entirely clear, on cross-examination at trial Shinnamon testified that the warrant was issued because Mr. Thompson pointed a firearm at her. The Government further explained at oral argument that this altercation occurred on October 24, 2001.

jacket over to Mr. Thompson, the detective checked the pockets of the light-green jacket and found twelve live rounds of ammunition.

Detective Michelle Floyd was assigned to this arrest, and she took custody of the bullets at the scene. However, the light-green jacket was not seized, photographed or inspected for fingerprints.[2] Detective Floyd performed an inventory search on the car and found numerous articles of clothing in the back seat and trunk. The car was then towed to C.J. Auto Sales.

Shortly after Mr. Thompson's arrest, Shinnamon told the police that the light-green jacket and the bullets belonged to Mr. Thompson. Shinnamon also permitted Detective Floyd to copy two answering machine messages she had received from Mr. Thompson after his arrest. One message included a request by Mr. Thompson that asked Shinnamon to "[g]o down there and get my clothes for me and my boots and my three jackets." Gov't Ex.8. About a week after Mr. Thomp-

---

[2]   Inexplicably, after the bullets were seized the jacket was placed back into the Neon, and it was not included in Detective Floyd's inventory search. Consequently, the jacket was not available as evidence at trial because the Indianapolis Police Department had chosen not to seize the jacket. *See* R.53 at 59. At trial, neither Detective Gray nor Detective Floyd knew what had happened to this jacket, nor could they provide relevant details about the jacket. Compounding this apparent error, as will be discussed more fully later, Mr. Thompson's companion, Shinnamon, changed her version of the events from initially telling police that the jacket belonged to Mr. Thompson, to testifying that she was the owner of the jacket and the bullets. The missing jacket became even more significant in light of this testimony, and the officers could not provide any detail about the jacket that would have assisted the fact finder in determining the actual ownership of the jacket.

son's arrest, the police released the car that Mr. Thompson had rented, and Shinnamon went to C.J. Auto Sales where she picked up the clothes, shoes and jackets from the car.[3]

# II

# DISCUSSION

## A. Evidentiary Ruling

Prior to trial, Mr. Thompson filed a motion in limine in which he sought to exclude, among other subjects, any testimony or questioning about certain prior convictions of Mr. Thompson or about his status as a suspect in any uncharged crimes. The Government did not object, and the district court granted the motion.

At trial, Shinnamon testified about the events described earlier, including her romantic relationship with Mr. Thompson and their travels together. Shinnamon admitted on direct examination that she initially had told police that the jacket and bullets belonged to Mr. Thompson. However, during her trial testimony, Shinnamon claimed that the bullets and light-green jacket were hers. R.53 at 97-98. Shinnamon testified on direct examination that she initially had not told the police the truth because she was angry with Mr. Thompson. Defense counsel further inquired:

Q    Did you think he would get into trouble?

A    I knew he would.

Q    Why, because of his prior criminal record?

---

[3] Shinnamon testified that she picked up three or four jackets that she claims belonged to her and a couple that belonged to Mr. Thompson. R.53 at 93-94.

    A  Yes.[4]

*Id.* at 98. Shinnamon further testified that she had not told Mr. Thompson before his arrest that she had purchased a gun or had bullets in her jacket.

After this testimony, but prior to Shinnamon's cross-examination, the Government requested that, despite the earlier ruling prohibiting mention of certain convictions and past conduct of Mr. Thompson, the Government now be permitted to raise evidence of past threats and past charges Shinnamon brought against Mr. Thompson.[5] The Government asserted that it had evidence that Mr. Thompson threatened Shinnamon and that her direct testimony regarding the light-green jacket and bullets may have been the product of Mr. Thompson's threats and intimidation. The district court ruled that the proposed cross-examination was "admissible to [Shinnamon's] credibility because if she is testifying under fear, coercion, or intimidation so that it calls into question what she says, the jury is entitled to make that assessment." *Id.* at 101.

On cross-examination, Shinnamon testified about Mr. Thompson's guilty plea to domestic battery against her. Specifically, she testified that Mr. Thompson previously had been convicted of domestic battery against her; she had suffered a black eye, and Mr. Thompson also had pointed a

---

[4]  The defense counsel also asked Shinnamon at the beginning of her direct examination whether she was "aware Michael Thompson has a criminal record?" to which Shinnamon responded in the affirmative. R.53 at 86-87.

[5]  Specifically, the Government sought relief from paragraph five of the Motion in Limine, R.53 at 99, a provision restricting the Government from discussing the "Defendant's purported status as a suspect in any other uncharged crimes," R.23, ¶ 5.

weapon at her. She further testified that she had provided police with other weapons that she claimed Mr. Thompson also had pointed at her. The prosecution also elicited testimony from Shinnamon that she had permitted the police to record answering machine messages left by Mr. Thompson after his arrest. The prosecution stated that, "In fact, he was threatening you, wasn't he?", to which Shinnamon responded, "Yes." *Id.* at 104. However, when asked by the Government whether "there could be repercussions for you if you don't sing his line," in her current testimony, Shinnamon denied any such fear. *Id.* Shinnamon nevertheless testified that, within the last six weeks, friends of Mr. Thompson's had come to her house at 3:00 a.m., prompting her to call the police.

After Mr. Thompson was convicted, he moved for a new trial. In Mr. Thompson's motion for a new trial, he argued that the Government improperly had elicited testimony from Shinnamon about his past conviction and conduct. The district court denied the motion for a new trial.

The district court held that testimony of the threats that Mr. Thompson allegedly had made against Shinnamon and testimony about prior charges that she brought against him did not violate Federal Rule of Evidence 403. The court reasoned that the evidence offered was admissible as to Shinnamon's credibility and could be used to examine Shinnamon's possible reason for changing her account of the events between Mr. Thompson's arrest and the trial. *Id.* at 10. The district court concluded that Shinnamon's testimony regarding Mr. Thompson's domestic battery conviction and other threats was relevant and highly probative of her bias and credibility. The district court further noted that the Government confined its cross-examination to only the subjects raised on direct examination. The past threats were relevant to explain Shinnamon's possible fear. Furthermore,

ruled the district court, the evidence of past violence only was offered after the defense attorney "opened the door to such testimony." R.38 at 8. Therefore, continued the court, the evidence did not produce a risk of prejudice sufficient to outweigh substantially the testimony's probative value.

Mr. Thompson now renews his contention that the district court erred when it allowed the Government, asserting its intention to impeach the witness by demonstrating her bias, to cross-examine Shinnamon about Mr. Thompson's past acts of physical violence or threats. He relies on our decision in *United States v. Thomas*, 86 F.3d 647 (7th Cir. 1996). We review the district court's evidentiary rulings under an abuse of discretion standard. *See United States v. Bonner*, 302 F.3d 776, 780 (7th Cir. 2002).

The Supreme Court has noted that

> [b]ias is a term used in the "common law of evidence" to describe the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party. Bias may be induced by a witness' like, dislike, or fear of a party, or by the witness' self-interest. Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony.

*United States v. Abel*, 469 U.S. 45, 52 (1984). "The admissibility of evidence regarding a witness's bias . . . in his testimony is not specifically addressed by the Rules and thus admissibility is limited only by the relevance standard of Rule 402." *United States v. Lindemann*, 85 F.3d 1232, 1243 (7th Cir. 1996) (citing 27 Charles Allen Wright & Victor James Gold, *Federal Practice and Procedure* § 6092 (1990)).

Relevant evidence is, of course, generally admissible, *see* Fed. R. Evid. 402, but even relevant evidence will be "excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury," Fed. R. Evid. 403. With respect to the admission of the evidence in question here, Mr. Thompson takes the view that, under Rule 403, the danger of unfair prejudice outweighs any probative value that the evidence might have. He submits that our decision in *Thomas* requires "evidence of threats to be directly and specifically linked to, and made because of, the witness' testimony and not" because of a "general fear of the defendant." Appellant's Br. at 17. Mr. Thompson emphasizes that, prior to admitting the evidence, the district court failed to make a finding that the witness was intimidated or threatened. He reasons that, if a witness does not appear intimidated, or the threat is not connected directly to the testimony of the witness, "there is too great a danger that the jury would use that evidence in a manner prohibited by" Federal Rule of Evidence 404. Appellant's Br. at 18. Without a direct connection between a threat and the witness' testimony, the prejudicial effect of the threat evidence will outweigh substantially the probative value of the evidence. Simply stated, Mr. Thompson contends that our holding in *Thomas* requires a "direct connection between the violence" and Shinnamon's testimony; otherwise, the threat evidence cannot pass the Rule 403 balancing test.[6] Appellant's Br. at 14.

We cannot agree that there is a general requirement that the threat of a party must be related specifically to a witness' courtroom testimony before such evidence and the

---

[6] Mr. Thompson asserts: "*Thomas* holds that, in *all* circumstances, the prejudicial nature of non-specific threat evidence outweighs its probative value for purposes of Rule 403 and, thus, is inadmissible." Appellant's Br. at 19.

suggestion of resulting bias can be introduced on cross-examination. Such a proposition, if accepted, would result in a significantly higher standard for admitting bias evidence under Rule 403 than is now employed by the courts. We do not believe that our decision in *Thomas* supports Mr. Thompson's position. In *Thomas*, the prosecution introduced evidence of a threat toward its own witness in order to "enhance[] the overall believability of the witnesses by showing that they testified against the defendants in the face of threats." *Thomas*, 86 F.3d at 654. We held that the probative value of the threat evidence was "extremely limited at best" because we could not ascertain "any need for the introduction of threat evidence to 'boost' the testimony of the witnesses." *Id.*[7] Therefore, we did not permit the evidence of threats to "boost" the witness' testimony because there was no behavior relevant to credibility that the Government needed to explain. The threat evidence in that case was not probative because it was only "admitted to permit the jury to evaluate fully the *general* 'credibility'

---

[7] Notably, the cases cited within *Thomas* also concern the use of threats to "boost" or "enhance" the testimony of the witness. *See Dudley v. Duckworth*, 854 F.2d 967, 970-71 (7th Cir. 1988) (discussing *direct* testimony offered by a prosecution witness and finding that threats made by the defendant were likely placed before the jury under a pretext because there was no indication in the record that the prosecution's witness was nervous, and, therefore, there was no need to introduce the evidence on direct examination other than to prejudice the defendant); *Gomez v. Ahitow*, 29 F.3d 1128, 1139 (7th Cir. 1994) (distinguishing the decision in *Dudley*, the court held that the prosecution was permitted to bring forth testimony of threats on direct examination to explain the witness' delay in providing information to the police because of her fear of the consequences); *United States v. DeLillo*, 620 F.2d 939, 945-46 (2d Cir. 1980) (discussing the government's ability to introduce evidence of threats to explain contradictory or inconsistent testimony by their witnesses).

and 'bias' " of the witness. *Id.* (emphasis added). When a party wishes to elicit on *direct* examination testimony about threats, there must be some specific purpose for introducing such evidence such as a witness' "courtroom demeanor indicating intimidation" or a witness' delay in testifying. *Id.* Absent some finding or demonstration that a threat would explain some "specific behavior of a witness that, if unexplained, could damage a party's case," the evidence does little, if anything, to demonstrate bias or to inform the jury's credibility determination. *Id.* Evidence of threats toward a witness offered on direct examination to "boost" or enhance the witness' credibility therefore should be linked specifically to a credibility problem; without the link to a specific credibility issue, the evidence has "extremely limited probative value." *Id.*

Evidence of threats on direct examination, admitted even though the witness shows no indication of intimidation, is not only of extremely weak probative value, but it also could constitute a prejudicial attack on the opposing party. *See Dudley v. Duckworth*, 854 F.2d 967, 971 (7th Cir. 1988) (suggesting that the prosecutor introduced the threat to prejudice the defendants rather than to explain away credibility problems of the witness). Such evidence can be highly prejudicial.

The situation is very different when the purpose of introducing evidence of a threat is to demonstrate bias on the cross-examination of a witness. In such a context, the probative value of such evidence is far more evident.[8] For instance, evidence of bias, including evidence of a threat, to

---

[8] *Cf. United States v. DeLillo*, 620 F.2d 939, 946 (2d Cir. 1980) ("[T]he balance between probativeness and prejudice will differ according to the purposes for which a piece of evidence is to be admitted.").

challenge the credibility of a witness who has made an inconsistent statement simply does not raise the same concerns as evidence of a threat offered, in the absence of a testimonial inconsistency, simply to "boost" a witness' testimony. Indeed, *Thomas*, although noting that the probative value of the threats was extremely low when there was no credibility problem to explain on direct examination, also remarked that, by contrast, threat evidence "can be relevant to explain a witness' inconsistent statements." *Thomas*, 86 F.3d at 654.[9]

In the present case, Shinnamon testified on cross-examination that Mr. Thompson had pleaded guilty to domestic battery against her.[10] Specifically, she stated that he

---

[9] *Cf. DeLillo*, 620 F.2d at 946. Similarly, a "death threat may be of very strong probativeness when it is directed against a witness and what is sought to be proved is that the witness' testimony was affected by it; and the prejudice is likely to be small because the jury will be instructed not to consider the threat on the question of the defendant's overall guilt." *Id*.

[10]

Q   Ms. Shinnamon, you have been the victim of some criminal conduct by the defendant to which he pled guilty, is that right?

A   Yes.

Q   Why don't you tell us what that was.

     THE COURT: Well, establish when it was first. Lay the foundation.

By MR. MORRISON:

Q   Yes. That's sometime in, I think it was January of this year, of 2002?

A   It was 2001 I believe.

(continued...)

---

(...continued)

Q   That he pled guilty to domestic batter against you?

A   Oh, that may have been when the court was, yes. It happened a year before that.

Q   And it happened the year before, but he plead guilty just this January?

A   Yes.

Q   What did that involve, what conduct did that involve?

A   We had a fight.

Q   But I mean he was physical with you. What did he do? What is the conduct that he did for which he was convicted?

A   He was physical.

Q   And by physical, how?

A   I had a black eye.

Q   And haven't you made previous records to the police about him threatening you with weapons? Yes?

A   Yes.

Q   In fact, the warrant that we have been discussing today which was served on him on November 21st was as a result of him pointing a weapon at you; is that correct?

A   Yes.

. . .

Q   How many times have you told the police that he's threatened you with a weapon?

A   Twice.

Q   In fact, you permitted the detective to copy your answering machine messages, didn't you, on your answering machine of him calling you?

A   Yes.

(continued...)

had threatened her at gunpoint at least twice in the past and that she had made previous calls to the police about his behavior. The Government also was permitted to elicit testimony that Shinnamon allowed a detective to copy answering machine messages that Mr. Thompson left shortly after he was arrested. Shinnamon admitted that these messages were threatening.

In ruling on the admission of evidence, the district court has broad discretion in weighing the probative value against any potential prejudice. Accordingly, we give that determination great deference.[11] Because the trial court is in a better position to evaluate both the probative and the prejudicial impact of evidence, "a reviewing court will not lightly overturn the trial court's assessment." *United States v. Peters*, 791 F.2d 1270, 1295 (7th Cir. 1986), *superseded by statute on other grounds as stated in United States v. Guerrero*, 894 F.2d 261, 267 (7th Cir. 1990).

---

(...continued)

Q    And some of the things he was saying to you wasn't very pretty, was it?

A    No.

Q    In fact, he was threatening you, wasn't he?

A    Yes.

Q.   And today you are sitting here, knowing that there could be repercussions for you if you don't sing his line, isn't that true?

A    No.

R.53 at 102-05.

[11] *See United States v. Falco*, 727 F.2d 659, 665 (7th Cir. 1984); *United States v. Frankenthal*, 582 F.2d 1102, 1107 (7th Cir. 1978).

Despite Mr. Thompson's assertions demanding a "specific link" between the threat and the witness' testimony, our precedent instructs that "evidence of threats is subject to the same Rule 403 balancing test as other relevant evidence." *Thomas*, 86 F.3d at 653 (quoting *United States v. Qamar*, 671 F.2d 732, 736 (2d Cir. 1982)).[12] The Government attempted to demonstrate that Shinnamon's fear of the defendant was a motivating force in her accepting responsibility for the bullets, testimony that differed from her initial account. In contrast to *Thomas*, the Government presented this evidence of Shinnamon's possible fear of Mr. Thompson in order to address specifically Shinnamon's inconsistent statements.[13]

---

[12] The court in *United States v. Manske*, 186 F.3d 770 (7th Cir. 1999), explained that there is no special foundational requirement for bias evidence and the party attempting to demonstrate bias should be able to prove any fact logically relevant to bias. *See id.* at 779 (quoting Edward J. Imwinkelreid, *Evidentiary Foundations*, 164 (4th ed. 1998)). "Thus, the only necessary questions the defendant need ask are the who, what, why, where and when of the specific incidents he claims give rise to bias." *Id.* (internal citations omitted). The court determined that the defendant did not need to ask explicitly whether the witness was "presently afraid" or whether the witness felt "pressured to testify a certain way." *Id.*

[13] As the Supreme Court has explained, bias may be induced by the witness' like, dislike or fear of a party, and these feelings toward a party may lead a witness to consciously or unconsciously slant their testimony. *United States v. Abel*, 469 U.S. 45, 52 (1984) (noting that bias describes "the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party"). By this proposition alone, it is evident that bias can spring from the general fear of a witness or the witness' "re-

(continued...)

Furthermore, Shinnamon's testimony regarding the owner-ship of the jacket was crucial. The defense theory rested on Shinnamon's testimony asserting her sole ownership of the bullets and Mr. Thompson's assertion that he had no knowledge of the bullets. The question of whether the jury believed Shinnamon's initial report to the police or her subsequent trial testimony was central to the jury's determi-nation of whether Mr. Thompson possessed the bullets for which he was charged. *See Qamar*, 671 F.2d at 736 (noting credibility was "central to the jury's determination" when holding that admission of threat evidence was permissible over a Rule 403 objection). The members of the jury had to decide whether they believed the prior statement or Shinnamon's in-court testimony. It is also significant that the prosecution connected the previous violence and threats to what Shinnamon conceded was a "threatening" message left by Mr. Thompson *after* he was arrested on the current § 922(g) charge. R.53 at 104. "[A]s finder of fact and weigher of credibility, [a jury] has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony." *Abel*, 469 U.S. at 52. Questioning a wit-ness' motives for testifying is precisely the type of inquiry permissible on cross-examination. *See United States v. Manske*, 186 F.3d 770, 777 (7th Cir. 1999) (concluding that attacking a witness' credibility with evidence of bias "is the 'quintessentially appropriate topic for cross-examination'" (quoting *Bachenski v. Malnati*, 11 F.3d 1371, 1375 (7th Cir. 1993))). The district court did not abuse its broad discretion

---

(...continued)

lationship" to the party, and the demonstration of bias does not require automatically the cross-examiner to produce a specific threat against the witness' testimony before demonstrating bias that is caused by fear.

in concluding that the evidence of threats and recent violence were probative of Shinnamon's credibility and bias. When admitted on cross-examination, this evidence of recent threats and violence was relevant and probative to demonstrate that Shinnamon, a witness who changed her pretrial testimony, was biased and therefore likely to slant or even fabricate her testimony in the defendant's favor.

Rule 403 also requires the district court to determine whether any danger of unfair prejudice substantially outweighs the probative value of the evidence at issue. It is not sufficient to find that the evidence is simply prejudicial because, as we have remarked in the past, all probative evidence is prejudicial to the party against whom it is offered.[14] Rather, the relevant inquiry is whether there was *unfair* prejudice from the introduction of Mr. Thompson's past violence toward Shinnamon. "Evidence is 'unfairly prejudicial if it appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or otherwise may cause a jury to base its decision on something other than the established propositions in the case.' " *Peters*, 791 F.2d at 1294 (quoting *Carter v. Hewitt*, 617 F.2d 961, 972 (3d Cir. 1980) (internal citations omitted)); *see also Adames*, 56 F.3d 737, 742 (7th Cir. 1995) (upholding the trial court's admission of evidence because the evidence was not "shocking or repulsive, such as to elicit an emotional response from the jury").

The defense first called Shinnamon as a witness; the defense also first referred to the defendant's prior criminal history, asking Shinnamon twice whether she was aware that Mr. Thompson had a criminal record.[15] The defense found it advantageous to use Shinnamon's knowledge of

---

[14] *See, e.g.*, *United States v. Adames*, 56 F.3d 737, 742 (7th Cir. 1995).

[15] *See supra* note 4 and accompanying text.

that past criminal record to explain her motivation to lie initially to the police. The prosecution then attempted to demonstrate why Shinnamon's first statement was the more credible of the two. In order to establish that Shinnamon had reason to fear the defendant, the prosecution cross-examined her about the threats and about the nature of her relationship with Mr. Thompson. We note that the prosecution was careful to limit its cross-examination to questions about the defendant's violence toward Shinnamon. Notably, the Government did not ask Shinnamon other questions concerning Mr. Thompson's extensive criminal record.

Because the questions on cross-examination regarding past violence were probative of the witness' bias and motives to testify, it was not an abuse of discretion for the district court to determine that the danger of unfair prejudice from that evidence did not substantially outweigh its probative value.

## B. Constitutionality of § 922(g)

Before trial, Mr. Thompson moved to dismiss the indictment on the ground that 18 U.S.C. § 922(g) exceeded Congress' power under the Constitution. The district court, relying on this court's decision in *United States v. Wesela*, 223 F.3d 656, 659-60 (7th Cir. 2000), denied Mr. Thompson's motion. In Mr. Thompson's motion for acquittal, he again argued that "the government failed to establish the 'in or affecting commerce' element of 18 U.S.C. § 922(g)." R.34, ¶ 2. The district court rejected this argument and further

concluded that the Government's evidence at trial[16] was sufficient to support the jury's verdict. R.38 at 1 n.1.

Mr. Thompson now contends that his possession of the twelve rounds of ammunition did not affect interstate commerce and therefore 18 U.S.C. § 922(g)(1) exceeds Congress' power and is unconstitutional. Mr. Thompson concedes that "this issue has been decided against him." Appellant's Br. at 23 (citing *Scarborough v. United States*, 431 U.S. 563 (1977), and *United States v. Harris*, 325 F.3d 865, 873-74 (7th Cir. 2003)). He finally asserts that the Supreme Court in *United States v. Lopez*, 514 U.S. 549 (1995), employed language that indicates that his possession of the ammunition was not economic activity that affects interstate commerce. Mr. Thompson, however, continues to "raise[] this issue so he may preserve his rights if the Supreme Court decides to revisit" its earlier decision. Appellant's Br. at 23.

We agree with Mr. Thompson that the issue of whether 18 U.S.C. § 922(g)(1) exceeds Congress' power to regulate interstate commerce has been decided against him. Indeed, we have considered and rejected the issue of whether the Supreme Court's holding in *Lopez* renders the statute unconstitutional. *See, e.g.*, *United States v. Fleischli*, 305 F.3d 643, 653 (7th Cir. 2002) (rejecting a similar commerce clause argument based on *Jones v. United States*, 529 U.S. 898 (2000)); *United States v. Lemons*, 302 F.3d 769, 771-73 (7th Cir. 2002) (rejecting similar argument based on *Lopez*); *United*

---

[16] During the trial, the Government called Patrick Donovan, an A.T.F. firearms crime analyst, to testify. Mr. Donovan stated that six of the rounds found in the pocket of the light-green jacket were from a manufacturer in Minnesota, and six of the rounds were from a manufacturer in Idaho. R.53 at 69, 71-72. Therefore, Mr. Donovan concluded that the ammunition must have moved in interstate commerce by virtue of their presence in Indiana.

*States v. Mitchell*, 299 F.3d 632, 633-35 (7th Cir. 2002) (reject-ing commerce clause argument based on *Lopez*, *Morrison v. United States*, 529 U.S. 598 (2000), and *Jones*); *United States v. Wesela*, 223 F.3d 656, 659-60 (7th Cir. 2000) (same); *United States v. Williams*, 128 F.3d 1128, 1133-34 (7th Cir. 1997) (rejecting commerce clause challenge based on *Lopez*).[17]

## Conclusion

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED

A true Copy:
Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

---

[17] In the present case, the ammunition was manufactured in Minnesota and Idaho. Mr. Thompson possessed it in Indiana. Prior movement across state lines is sufficient to satisfy the in-terstate commerce clause requirement. *See United States v. Lemons*, 302 F.3d 769, 772 (7th Cir. 2002).