In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-3327

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JARRETT M. JAMES,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Wisconsin.

No. 07 CR 163—**Barbara B. Crabb**, *Chief Judge*.

ARGUED MAY 7, 2009—DECIDED JULY 9, 2009

Before FLAUM and WILLIAMS, *Circuit Judges*, and
LAWRENCE, *District Judge*.[1]

FLAUM, *Circuit Judge*.   Facing trial on two counts of
armed bank robbery and two counts of brandishing a

---

[1] The Honorable William T. Lawrence of the United States
District Court for the Southern District of Indiana, sitting by
designation.

firearm during those robberies, Jarrett James moved to suppress evidence obtained from a safe seized from his mother's home. The district court denied James's motion to suppress. Following a three-day trial, a jury returned guilty verdicts against James on the four counts. The district court sentenced James to 42 years in prison. James has appealed the district court's ruling on his motion to suppress, and we now affirm.

## I. Background

On March 16, 2006, a robbery occurred at the Middleton, Wisconsin, branch of Bank Mutual. The robber confronted all three tellers present and took money from each of their drawers. He then asked about an unmarked, closed door behind the teller counter, and the tellers led him into the bank vault. The robber demanded, and received, the cash from the vault. The robber fled with $62,288.71.

The tellers described the robber as an African American male who wore gloves and concealed most of his face with a stocking cap and hood. They estimated he was in his late twenties to early thirties, stood approximately 5'7" to 5'10", and weighed approximately 180-200 pounds. The tellers described the weapon used in the hold-up as a small gun, with reddish or rusty discoloration. A witness from a nearby apartment complex saw a large black car, either a Crown Victoria or Grand Marquis, in the vicinity around the time of the robbery. The vehicle had distinctive, five-spoke rims. Police uncovered tire tracks in the snow.

On April 14, 2006, another robbery took place at the same Middleton branch of Bank Mutual. Without asking for money from teller drawers, the robber immediately ordered the tellers to unlock the unmarked, closed door behind the counter. He entered the vault with two tellers and obtained $58,700.00. Tellers recounted that the robber wore dark clothing, a hooded sweatshirt, a scarf which obscured his face, and pink fleece gloves. They described him as an African American male, approximately 25-30 years old, standing approximately 5'7" to 5'9" tall, and weighing 180-200 pounds. Tellers described the gun used in the second robbery as a large, black, semi-automatic weapon. Again, a witness saw a large, black vehicle parked near the bank shortly before the robbery. The vehicle had the same distinctive rims.

On April 16, 2006, two days after the second robbery, police received a phone call reporting that an African American male had pulled up to a dumpster in a black Mercury and had thrown away a pink or red colored item. Police retrieved a pink fleece glove.

On April 19, 2006, a police officer observed a black 1994 Mercury Grand Marquis with shiny rims matching the witness descriptions obtained after the bank robberies. The officer conducted a traffic stop of the vehicle for failure to have a front license plate, a violation in Wisconsin. He identified the driver of the vehicle as defendant Jarrett James. Dane County jail records showed James' date of birth as 7/31/79 and described him as an African American male, 5'10" tall, and 180 pounds.

On October 24, 2006, with James suspected of both robberies, detective Darrin Zimmerman of the Middleton

police department interviewed James's mother, Linda Martin. Martin told Zimmerman that James resided with her at her home at 4009 Claire Street in Madison, Wisconsin, in early 2006. James used 4009 Claire Street as his address on important documents such as his car title. Martin indicated that she had seen a gun in her residence when James resided with her. She recounted that when she found it, she told James to remove it from the residence. Beginning in March 2006, James rented an apartment at 803 North Thompson Drive in Madison pursuant to a six-month lease. Martin informed Zimmerman that James had been arrested in Nebraska in May 2006 and was incarcerated there awaiting trial. When James's lease on the North Thompson Drive apartment expired in September 2006, Martin retrieved James's belongings from the apartment and took them back to her house. At the end of the October 24 interview, Zimmerman left Martin his business card to enable her to contact him if she had any questions or further information.

Zimmerman then confirmed with the Omaha, Nebraska, police department that on May 16, 2006, James and a companion were arrested in Omaha after a traffic stop. They were in a Lexus and James was the driver. In the trunk of the car, police found a large black duffel bag containing marijuana, a scale, and a gun. The firearm was a Taurus semi-automatic with a silver slide and black handle, and that gun matched the description of the gun used in the second Middleton bank robbery.

On October 30, 2006, Martin left a voice message at Zimmerman's work phone number stating that she had

received a letter from James telling her there was a gun inside her residence in a safe that belonged to James. Martin stated in the message that she was not going to open the safe before police came over to her residence. Zimmerman responded to Martin's message and told her he would like to come to her residence and assist her with turning the gun over to police. Martin did not object to that plan.

On October 31, 2006, Attorney Terry Frederick left a message for Zimmerman stating he had been retained by Martin and wanted all further contact to come through him. On November 1, Zimmerman returned Frederick's call. Zimmerman advised Frederick that he was interested in evidence contained in Martin's residence. Frederick said that he was not aware of Martin having any information regarding the bank robberies. Zimmerman and Frederick agreed to meet at Martin's residence concerning the evidence.

On November 2, 2006, Zimmerman and another detective met Martin and Frederick at Martin's residence. Martin opened a closet and pointed to a safe on the floor of the closet. Martin said that the safe belonged to James and that the gun she had referenced was inside. Zimmerman told Frederick and Martin that he intended to seize the safe so the evidence was not destroyed, and he would then obtain a search warrant before opening the safe. Zimmerman did not provide a formal consent form. Neither Martin nor her attorney objected to Zimmerman's plan; they remained silent. Martin provided Zimmerman with the keypad code for the safe.

The meeting ended cordially, and Zimmerman left with the safe.

A state judge then issued a search warrant for the safe, and police opened the safe after the warrant issued. They recovered contraband, including a gun that matched descriptions of the gun used during the first robbery. They also recovered receipts and other evidence of large cash purchases that James had made in the time period immediately after the robberies. Based on that evidence, Middleton police contacted the previous owner of the Lexus that James had been driving in Nebraska. Police learned that in late April 2006, James had purchased the Lexus for $15,500.00. He paid in 155 sticky and crisp $100 bills, and he made the payment without checking out the used car or negotiating the price. Police also located the Grand Marquis, which had been abandoned, and matched the tire tracks found at the first bank robbery.

On December 5, 2007, a federal grand jury in the Western District of Wisconsin returned a six-count indictment charging James with two counts of armed bank robbery, two counts of brandishing a firearm during those bank robberies, one count of possessing cocaine base with the intent to distribute (there was also cocaine in the safe), and one count of possessing a firearm in furtherance of that drug crime. At the government's request, the district court later dismissed the drug charge and the drug-related firearm charge.

On May 1, 2008, James filed a motion to suppress seeking to bar the government from introducing at trial the safe, its contents, and any evidence derived from it.

On May 14, 2008, Magistrate Judge Stephen Crocker conducted an evidentiary hearing on James's motion to suppress. Zimmerman and Frederick testified. Zimmerman testified that after he seized the safe, he "didn't open it without a search warrant." On May 30, 2008, the magistrate judge recommended that the district court deny James's motion to suppress evidence. The magistrate's report stated that James was conflating his possessory interest in the safe with his privacy interest in its contents. The report added that it was not even clear that removal of the safe from Martin's home constituted interference with James's possessory interest. In any event, the report concluded that Martin had the right to allow police to enter the home, and police had probable cause to secure the container before the state issued a warrant to search its contents.

On June 3, 2008, James objected to the recommendation. He argued that the magistrate erred in concluding both that police could seize his property without a warrant, and that James had no interest in the safe that was infringed by removing the safe from Martin's home without his consent.

The district court adopted the magistrate's recommendation and denied James's motion to suppress. The court stated the "only question to be decided in determining the constitutionality of the seizure of the safe [was] whether the seizure violated any possessory interest of defendant," and it concluded that "[c]learly it did not."

The case went to trial on June 16, 2008. The government introduced evidence that: (1) James matched the

tellers' physical descriptions of the robber from both robberies; (2) he drove, at the time of the robberies, a vehicle matching the description of a car seen parked near the bank at both robberies, and tire marks left in the snow outside the bank matched the tires on his car; (3) the robber in the second robbery wore hot-pink fleece gloves, and two days after that robbery a witness saw someone matching James's description and driving a car matching the vehicle observed at the scene of the robberies tossing what turned out to be a hot pink-colored glove in a dumpster, and subsequent testing developed James's DNA inside the glove; (4) James confessed to Nebraska inmate Lateeno Mills that he committed the two Wisconsin robberies; (5) a gun that matched descriptions of the gun used in the second robbery was recovered from James at the time of his Nebraska arrest; (6) the safe seized from Martin's Madison residence contained a gun that matched descriptions of the gun used in the first bank robbery; and (7) James made large cash purchases shortly after the second robbery. Based on that evidence, on June 18, 2008, the jury returned guilty verdicts against James on all charges. On September 4, 2008, the district court sentenced James to 42 years in prison.

## II. Analysis

James claims that we should vacate the district court's judgment and sentence because the court failed to suppress the items found in the safe that authorities removed from Martin's home and, after obtaining a

search warrant, searched. The district court's denial of James's suppression motion is subject to a dual standard of review. We review legal conclusions de novo and findings of fact for clear error. *United States v. Whited*, 539 F.3d 693, 697 (7th Cir. 2008).

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. In clarifying that the amendment addresses property interests in addition to privacy concerns, the Supreme Court defined the amendment's use of the term "seizure" as "some meaningful interference with an individual's possessory interests in [his] property." *Soldal v. Cook County*, 506 U.S. 56, 61 (1992) (citing *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)). Thus, James holds two interests protected by the Fourth Amendment that were implicated by the seizure of the safe and the subsequent search: (1) his privacy interest in the contents of the safe; and (2) his right to possess the safe. *See United States v. Ward*, 144 F.3d 1024, 1031 (7th Cir. 1998). James's privacy interest in the contents of the safe is not at issue in this case. After law enforcement officers removed the safe from James's mother's home, they obtained a search warrant before opening and searching the safe, and James does not challenge that search.

Only James's interest in possessing his safe free from government seizure is at issue. In the typical case, a "seizure of personal property [will be] per se unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant

issued upon probable cause and particularly describing the items to be seized." *United States v. Place*, 462 U.S. 696, 701 (1983). However, because the Fourth Amendment, at bottom, prohibits only "unreasonable" seizures, the Supreme Court has recognized that a balancing must take place, and that there are instances where societal interests outweigh the individual's right to be free from the government's unauthorized exercise of dominion over his private property. *Id.* at 701-03; *Jacobsen*, 466 U.S. at 125. For instance, if "law enforcement authorities have probable cause to believe that a container holds contraband or evidence of a crime, but have not secured a warrant," seizure of the property is permitted "pending issuance of a warrant to examine its contents, if the exigencies of the circumstances demand it or some other recognized exception to the warrant requirement is present." *Place*, 462 U.S. at 701.

Here, the government argues, a recognized exception to the warrant requirement was present: third party consent. Because a person may voluntarily waive his Fourth Amendment rights, no warrant is required where the defendant consents to a search. *United States v. Matlock*, 415 U.S. 164, 171 (1974). Based on the concept of assumption of risk, that exception to the warrant requirement extends to consent legitimately obtained from a third party. *Id.*; *United States v. Duran*, 957 F.2d 499, 504 (7th Cir. 1992). Thus, where a defendant allows a third party to exercise actual or apparent authority over the defendant's property, he is considered to have assumed the risk that the third party might permit access to others, including

government agents. *Matlock*, 415 U.S. at 171 n.7; *United States v. Jensen*, 169 F.3d 1044, 1048-49 (7th Cir. 1999). James agrees that if Martin had actual or apparent authority to consent to the seizure of James's property, and if Martin actually consented voluntarily, then no constitutional violation occurred here.[2] James argues, however, that Martin had neither actual nor apparent authority to consent. In addition, he argues that even if Martin did have authority to consent, she did not actually do so voluntarily.

We turn first to whether Martin had actual or apparent authority to consent. The government has the burden of proving authority to consent by a preponderance of the evidence. *United States v. Denberg*, 212 F.3d 987, 991 (7th Cir. 2000) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990)). Consent to a search or seizure may be obtained from any person who has common authority over the property (actual authority), *Denberg*, 212 F.3d 987, 991 (7th Cir. 2000), or who would appear to a reasonable person, given the information that law enforcement possessed, to have common authority over the property (apparent authority). *United States v. Basinski*, 226 F.3d 829, 834 (7th Cir. 2000). In the search context, the Supreme Court has expounded: "The authority which justifies the third-party consent . . . rests rather on mutual use of the property by persons generally having joint access or control for most purposes." *Matlock*, 415 U.S. at 171 n.7. Adopting the

---

[2]   James does not dispute that law enforcement had probable cause to make the seizure.

Court's guidance to an initial seizure, as opposed to a subsequent search, we can conclude that Martin had authority to consent if: (1) she had joint control of or access to the safe itself (regardless of whether she had access to the contents of the safe) (actual authority); or (2) it was reasonable for police to believe she had joint control of or access to the safe itself (apparent authority).

Below, the government submitted evidence that James lived with Martin at 4009 Claire Street off and on, including during the time of the bank robberies. In late March 2006, James had also leased an apartment at 803 North Thompson Drive. When the lease expired, Martin gathered James's belongings from that apartment and brought them to her residence at 4009 Claire Street, and Martin had maintained possession of them since then. The district court found that the safe was at Martin's house because James had left it with her when he took off for Nebraska. That finding is supported by the record, and it was not clearly erroneous. It is clear that Martin possessed the safe for a significant period of time. Even though the safe contained only James's belongings, Martin exercised control over the safe itself. There is no evidence that James attempted to limit or restrict her control over the safe. On these facts, we can conclude that James assumed the risk that Martin would consent to the safe's seizure; Martin had actual authority to consent. Even if James had not granted actual authority to Martin, she had apparent authority because a reasonable person, given the information that Detective Zimmerman possessed, would believe that Martin had joint control of the safe.

We next consider whether Martin actually and voluntarily did consent to the seizure. The government bears the burden of proving that a third party consented voluntarily. *United States v. Evans*, 27 F.3d 1219, 1230 (7th Cir. 1994) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973)). James argues that Martin's silence as Zimmerman seized the safe cannot constitute consent. However, we recognize that consent may be manifested in a non-verbal as well as a verbal manner. *United States v. Walls*, 225 F.3d 858, 863 (7th Cir. 2000). Consent can be expressed or implied from the circumstances. *United States v. Wesela*, 223 F.3d 656, 661 (7th Cir. 2000). In *Wesela*, we determined that a woman who had called 911 and requested that police come to her home had "impliedly" consented to a search of the premises. While there was no direct verbal exchange between the woman and law enforcement officers, we stated that the events indicated her implicit consent and stated that "had she wished to do so, she could have objected to [the] . . . search." *Id.*

In this case, the government submitted evidence demonstrating that Martin called Zimmerman on October 30, 2006, left a message for him about the gun, and told him that she would not open the safe without police present. In a return call, Zimmerman told Martin he would like to assist her with turning the gun over to police. On November 1, Zimmerman spoke with Martin's attorney and told him that police were interested in evidence contained in the safe, and the two of them made arrangements to meet at Martin's residence. Martin's attorney had no objection to this process. On November 2, Zimmerman met with Martin and her attorney at Martin's

residence. Martin invited Zimmerman to come in, led Zimmerman to the safe, and said that the gun was inside. Zimmerman advised Martin and her attorney that he would seize the safe to protect the evidence, but that he would obtain a search warrant before searching inside the safe. Martin and her attorney could have voiced their objections to Zimmerman's plan, but neither objected. The government submitted sufficient evidence for us to conclude that Martin voluntarily consented, through her words and actions, as a matter of law.

Finally, even if there had been error in the district court's failure to suppress the evidence seized from the safe, any such error would have been harmless. If the government had never uncovered evidence from the safe, at the least it still would have presented: (1) the testimony of the victim tellers whose descriptions of the robber during both robberies matched the defendant's physical characteristics; (2) evidence describing the vehicle seen near the bank at the approximate times of both bank robberies, and the evidence that the defendant was stopped driving a vehicle that exactly matched that description; (3) the pink fleece glove, which matched the description of the gloves worn by the robber during the April 14 robbery, and which contained James's DNA as the major component of the DNA identified inside the glove; (4) evidence that James was positively identified driving his vehicle two days after the second robbery, and was seen tossing a pink glove in a dumpster; (5) evidence that the handgun used in the April 14 robbery was recovered during the Nebraska arrest; and (6) evidence of James's detailed admissions to

both robberies made to an inmate in the Nebraska jail. We believe that the jury would have convicted James of the two counts of armed bank robbery and the two counts of brandishing a firearm during those bank robberies even without evidence from the safe.

### III.  Conclusion

We AFFIRM the judgment and conviction order of the district court.