In the

# United States Court of Appeals

## For the Seventh Circuit

No. 20-1415

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

SHAWN BACON,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Indiana, Fort Wayne Division.
No. 1:18-CR-1-HAB — **Holly A. Brady**, *Judge.*

ARGUED JANUARY 12, 2021 — DECIDED MARCH 22, 2021

Before EASTERBROOK, WOOD, and ST. EVE, *Circuit Judges.*

ST. EVE, *Circuit Judge.* The controlled buy is a familiar law
enforcement tool. In a typical case, officers enlist a confiden-
tial informant to buy drugs from a suspected dealer. To pro-
tect against informant deception, officers search the informant
before and after the buy and frequently wire him so that they
can listen in on the transaction. We have held that "a con-
trolled buy, when executed properly," is generally "a reliable

indicator as to the presence of illegal drug activity." *United States v. Sidwell*, 440 F.3d 865, 869 (7th Cir. 2006).

This case presents a novel variation on the classic controlled buy. After receiving anonymous tips that Shawn Bacon was selling drugs from his home, officers conducted two controlled buys. These controlled buys were unique in that there was a second layer of separation between the officers and Bacon: an acquaintance of the informant who acted as a middleman. At the informants' requests, the middlemen went to Bacon's home, bought drugs from Bacon (or so they said), and then gave the drugs to the informants, who turned them over to the police. Officers kept the informants under close watch, but they did not search or wire the middlemen, who were unaware of law enforcement involvement. These middlemen were unwitting participants in the controlled buys.

Based largely on the anonymous tips and the controlled buys, officers obtained a warrant to search Bacon's home, where they found an array of drugs and weapons. Federal charges followed, and a jury convicted Bacon on all counts. On appeal, Bacon submits that the district court should have granted his motion to suppress because, in his view, the "uncontrolled" middlemen derailed probable cause for the search warrant. He also challenges the court's denial of his motion for a *Franks* hearing and the sufficiency of the evidence at trial. We affirm.

## I. Background

Officers of the Fort Wayne Police Department submitted an affidavit to a state-court judge seeking a warrant to search Bacon's home at 1728 ½ High Street. The affidavit set forth the following facts. Officers received a tip that Shawn Bacon,

living at 1728 ½ High Street, was a known drug dealer who had been arrested for selling cocaine from his home in the past. The tipster told officers that Bacon had almost killed his brother twice by supplying him with heroin. The tipster added that Bacon used silver and black Chevy Impalas to deliver drugs. Officers later observed Bacon (whose appearance they confirmed through a police database and Facebook) entering and exiting 1728 ½ High Street and using both vehicles. They ran the plates on the silver Impala, and the owner came back as Shawn Bacon residing at 1728 ½ High Street.

Eleven days after the first tip, officers received a second tip, this one stating that Shawn Bacon, a resident of the upstairs apartment at 1728 High Street (which is in fact 1728 ½ High Street), was selling large amounts of heroin, cocaine, and meth to the tipster's friends. The tipster said that Bacon was a convicted felon who had multiple guns in his residence. Officers later confirmed that Bacon had a prior felony conviction for dealing narcotics.

To further corroborate the tips, officers arranged a controlled buy. They first enlisted a confidential informant who had proven credible and reliable in past cases. The informant, in turn, reached out to an acquaintance who said he could buy cocaine, heroin, meth, and guns from Bacon. Before the buy, officers searched and wired the informant. The officers then drove with the informant to the acquaintance's house. From there, the informant and the acquaintance drove together to Bacon's apartment. Surveillance units followed separately. When they arrived at Bacon's apartment, the informant gave the acquaintance $100 to buy cocaine and told him to keep $20 for his trouble. Officers then observed the acquaintance enter the upstairs apartment. He exited 18 minutes later, got back

into the car with the informant, and handed the informant the cocaine, explaining that Bacon had weighed it out at 1.5 grams. The acquaintance also told the informant that Bacon had weapons all over his apartment. (The officers heard these conversations because the informant was wearing a wire.) After parting ways with the acquaintance, the informant met the officers and gave them the cocaine. The officers again searched the informant and found no contraband.

A few weeks later, officers conducted a second controlled buy. They enlisted a different confidential informant who had also proven credible and reliable in past cases. The informant arranged to buy drugs from an acquaintance who lived down the street from Bacon. Before the buy, officers searched and wired the informant. The officers then drove with the informant to the acquaintance's house. Once there, the informant gave the acquaintance $260 to buy cocaine and meth. The acquaintance took the money and walked toward Bacon's apartment. A surveilling officer saw the acquaintance enter Bacon's apartment and exit 17 minutes later, heading back toward his own house. When the acquaintance got home, he motioned for the informant to come inside. Once inside, the acquaintance weighed and bagged the cocaine and then gave the informant the cocaine along with a separate bag of meth. (Again, the officers heard this exchange because the informant was wearing a wire.) The informant left the acquaintance's house, got back into the officers' car, and handed them the drugs. After the buy, the informant told the officers that the acquaintance had purchased drugs from someone named "Shawn" who had numerous weapons in his apartment.

Based on these facts, a state-court judge issued a warrant authorizing a search of 1728 ½ High Street for drugs and

guns. Officers executed the warrant less than a week later. They found guns; ammunition; a bulletproof vest; suspected bombs; large quantities of meth, cocaine, and fentanyl; a digital scale; and a drug ledger. Later that day, officers stopped Bacon in his car and arrested him. They searched the car and found drugs and several guns, including two short-barreled rifles. A week later, officers searched Bacon's home again and found more meth, cocaine, and fentanyl. A federal grand jury indicted Bacon on several counts related to his armed drug dealing and possession of short-barreled rifles and explosive devices.

Before trial, Bacon moved to suppress the evidence from the initial home search on the ground that the affidavit did not supply probable cause. The district court denied his motion. After learning that both middlemen who bought drugs from him during the controlled buys were later arrested on drug charges, Bacon moved the court to reconsider its denial of his motion to suppress. The court denied the motion. Bacon also moved for a *Franks* hearing, arguing that the affidavit had omitted critical facts about the credibility of the middlemen. The court denied that motion too. Bacon went to trial and the jury convicted him on all counts. Bacon now appeals.

## II. Discussion

### A. Probable Cause

Bacon's principal contention is that there was no probable cause for the warrant to search his home. He admits that controlled buys ordinarily go a long way toward establishing probable cause, *see Sidwell*, 440 F.3d at 869, but he maintains that the controlled buys in this case were defective because the actual buyers were an unknown quantity—officers did

not know them, search them, or wire them. In short, they were not "controlled," so these were not valid controlled buys.

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. Probable cause for issuance of a search warrant exists if there is "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). This is a "practical, common-sense" inquiry based on "all the circumstances." *Id.* "[T]he duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." *Id.* at 238–39 (internal quotations, citation, and alterations omitted). We review the district court's factual findings for clear error and its legal conclusions de novo. *United States v. Rees*, 957 F.3d 761, 764 n.1 (7th Cir. 2020).

We begin by acknowledging that the controlled buys in this case present novel risks. "The use of an unwitting informant introduces an additional layer of uncertainty to the transaction because it leaves open the possibility that the narcotics were acquired not at the suspect residence but at the location where the confidential and unwitting informants met before and after the transaction." *United States v. Artez*, 389 F.3d 1106, 1112 (10th Cir. 2004). Here, officers did not search or wire the middlemen, so they could not confirm whether the middlemen obtained the drugs from Bacon or from their own stashes.

At the same time, many of the concerns about voluntary government informants are inapplicable to unwitting informants. Government cooperators merit skepticism because they often have motives to lie such as payment, leniency, or animosity toward a rival. *United States v. Glover*, 755 F.3d 811, 816

(7th Cir. 2014); *United States v. Olson*, 408 F.3d 366, 370–71 (7th Cir. 2005); *United States v. Cook*, 102 F.3d 249, 251 (7th Cir. 1996). Unwitting informants, by contrast, have "nothing to gain" from participating in controlled buys. *United States v. Gunter*, 551 F.3d 472, 480–81 (6th Cir. 2009). Officers have not promised them anything and they have no incentive to shift blame because they do not know that law enforcement is involved. To the contrary, unwitting informants have quite a bit to lose. The unwitting informants in this case exposed themselves to criminal liability by participating in illegal drug transactions. The incriminating nature of their statements and actions in the controlled buys bolsters the reliability of those statements and actions. *See id.* (unwitting informant's statements were reliable because he did not know officers were recording him and he had nothing to gain from implicating the defendant in a drug deal that also implicated him); *cf. Olson*, 408 F.3d at 371 (an informant's statement against penal interest "carries with it a presumption of reliability").

On balance, we conclude that the controlled buys in this case were reliable indicators that Bacon was selling drugs from his home. *See Sidwell*, 440 F.3d at 869. As in other cases, the officers here did not actually see the drug sales. *See, e.g., id.*; *United States v. McKinney*, 143 F.3d 325, 329 (7th Cir. 1998). Still, they watched and listened as the confidential informants discussed the transactions with the middlemen; observed the middlemen enter and exit Bacon's apartment; and obtained the drugs from the confidential informants immediately after the transactions. The main point of uncertainty is whether the middlemen bought the drugs at Bacon's apartment. Bacon hypothesizes, for example, that the middlemen could have stood in his stairwell for 15 minutes, pretending to buy drugs, only to sell their own drugs to the informants with impunity. We

acknowledge this theoretical possibility, but we do not find it troublesome on these facts. We have rejected similarly speculative arguments in the context of standard controlled buys. *See, e.g.*, *Sidwell*, 440 F.3d at 869. Here, Bacon's argument is particularly unpersuasive because, by all appearances, the middlemen did not know that they were participating in controlled buys. Bacon does not explain what possible motive they could have had for deceiving the confidential informants about the source of the drugs.

For these reasons, we hold that the unwitting informants did not detract from the probative value of the controlled buys. We note that several other circuits have approved of controlled buys involving unwitting informants. *United States v. Washington*, 775 F.3d 405, 407–08 (D.C. Cir. 2014); *Artez*, 389 F.3d at 1112–13 (collecting cases); *see also Gunter*, 551 F.3d at 480–81.

We further hold that the controlled buys, along with the other materials in the affidavit, supplied probable cause for the search warrant. Officers received two anonymous tips, close together in time, that Bacon was selling drugs from his home. The officers corroborated the tipsters' information as to Bacon's cars, address, and criminal record. They then conducted two controlled buys from Bacon's residence. *See McKinney*, 143 F.3d at 329 ("Controlled buys add great weight to an informant's tip."). The middlemen who entered Bacon's apartment not only acquired drugs; they also told the informants that Bacon, a convicted felon, had weapons all over his apartment. On these facts, the state-court judge had a substantial basis for concluding that there was a "fair probability" that officers would find evidence of illegal drug dealing activities at 1728 ½ High Street—even if the officers never saw

Bacon himself selling drugs. *See Gates*, 462 U.S. at 238–39 (Probable cause exists if there is "a fair probability that contraband or evidence of a crime will be found *in a particular place*.") (emphasis added).

## B. *Franks* Hearing

Next, Bacon claims that he was entitled to a *Franks* hearing. Under *Franks v. Delaware*, 438 U.S. 154 (1978), a search warrant is invalid if the police obtain it by deliberately or recklessly presenting false, material information to the issuing judge. *Id.* at 155–56. *Franks* also extends to "deliberately or recklessly deceptive omissions." *United States v. McMurtrey*, 704 F.3d 502, 508 (7th Cir. 2013). To obtain a *Franks* hearing, a defendant must "make a substantial preliminary showing (1) that the warrant application contained a material falsity or omission that would alter the issuing judge's probable cause determination, and (2) that the affiant included the material falsity or omitted information intentionally or with a reckless disregard for the truth." *United States v. Clark*, 935 F.3d 558, 563 (7th Cir. 2019). When a warrant application depends heavily on the credibility of an informant, the omission of facts bearing on the informant's credibility may be material. *See id.* at 564–66. We review a district court's denial of a *Franks* hearing for clear error and review the court's legal conclusions de novo. *Id.* at 563–64.

We see no error in the court's denial of a *Franks* hearing. Bacon faults officers for omitting that they did not know or search the middlemen and that neither they nor the confidential informants saw or heard the actual purchases. These omissions were immaterial because they were "clear from the face of the affidavit." *United States v. Spears*, 673 F.3d 598, 605 (7th Cir. 2012). The only reasonable interpretation of the

affidavit is that officers did not know, search, or wire the mid-dlemen. The affidavit describes how officers knew, searched, and wired the confidential informants. The omission of these same facts for the middlemen implies that they did not exist. And the affidavit is clear that neither the officers nor the confidential informants accompanied the middlemen into Bacon's apartment. The affidavit describes officers watching the middlemen enter and exit Bacon's apartment while they and the confidential informants waited nearby in cars.

Tellingly, Bacon's only apparent basis for knowing about these omissions is the affidavit itself. If the omissions are plain to Bacon from the face of the affidavit, why would they not have been plain to the state-court judge issuing the warrant? *See United States v. Wilburn*, 581 F.3d 618, 625 (7th Cir. 2009) (reasoning that the tipster's personal knowledge would have strengthened affidavit but that its omission was immaterial because "the affidavit assumes no personal knowledge on the part of the tipster, and the magistrate issued the warrant in spite of its absence"). There is no need to hold a hearing to uncover facts that are apparent from the face of the affidavit.

Bacon also faults officers for failing to disclose that the middlemen were going to be arrested. In his view, the arrests negatively affected their credibility. Bacon supplies nothing but pure speculation, however, for his assumption that officers knew about these impending arrests, one of which happened almost a year after the first controlled buy. In any event, these omissions, too, were immaterial. The affidavit describes the middlemen buying drugs from Bacon and reselling them to the confidential informants. It is hard to see how their eventual arrests on drug charges damaged their credibility when the affidavit already described them selling (or at

least reselling) illegal drugs. And this segues to a broader point: probable cause did not hinge on the credibility of the middlemen. As we have said, credibility concerns arise when informants have motives to lie. *See Glover*, 755 F.3d at 816; *Olson*, 408 F.3d at 370–71; *Cook*, 102 F.3d at 251. The unwitting informants in this case had no motive to lie, so their credibility is beside the point. *See Gunter*, 551 F.3d at 480–81.

### C. Sufficiency of the Evidence at Trial

Finally, Bacon argues that the government failed to prove certain elements of the charged offenses at trial, such that the district court should have granted his motion for a judgment of acquittal. We review a district court's denial of a motion for a judgment of acquittal de novo, viewing the evidence in the light most favorable to the prosecution. *United States v. Tantchev*, 916 F.3d 645, 650 (7th Cir. 2019). We affirm "if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (internal quotations, citation, and alteration omitted).

Bacon first challenges the jury's finding that he possessed a "destructive device" for purposes of Count 5, which charged him with possessing an unregistered firearm, and Count 6, which charged him with possessing a firearm in relation to a drug-trafficking offense. *See* 26 U.S.C. §§ 5841, 5861(d); 18 U.S.C. § 924(c). The jury instructions defined "destructive device" as "any explosive or incendiary bomb, or any combination of parts either designed or intended for use in converting any device into any explosive or incendiary bomb and from which an explosive or incendiary bomb may readily be assembled." *See* 18 U.S.C. § 921(a)(4); 26 U.S.C. § 5845(f); *United States v. Lockwood*, 789 F.3d 773, 779 (7th Cir. 2015).

The evidence permitted a rational jury to find that Bacon possessed a destructive device. The officers who searched Bacon's home found a large drink container and a galvanized steel pipe, both of which had fuses coming out of them. X-rays showed that the devices contained powder and ammunition. An ATF bomb technician testified that lighting the fuse to either device would cause an explosion. He further testified that the devices were "explosive devices" or "bombs." An ATF chemist testified that some of the powder samples from the devices were "explosive mixtures." She classified the devices as low-grade explosives. Based on this evidence, a rational jury could find that the devices were explosive bombs and thus destructive devices. Because the evidence supported the jury's finding that Bacon possessed a destructive device, we need not consider his argument that he did not know that his rifles had illegally short barrels, such that they could not qualify as illegal firearms for purposes of Count 5.

Next, Bacon argues that the government failed to prove that he knowingly possessed body armor for purposes of Count 4, which charged him with possessing body armor after a conviction for a crime of violence, in violation of 18 U.S.C. § 931(a)(1)). We disagree. Officers found a bulletproof vest in Bacon's closet, along with firearms. The government introduced the vest at trial and offered testimony that it was a "bulletproof vest" or "body armor" designed to be worn over clothing to protect against gunfire. The vest had a tag inside listing the manufacturer as "Point Blank Body Armor." A jury could conclude that Bacon—who had weapons galore in his home and car—knew that the vest was body armor.

Bacon's last challenge is to drug quantity. He claims the government failed to prove that he possessed with intent to

distribute at least 400 grams of a mixture or substance containing fentanyl, as charged in Count 1. *See* 21 U.S.C. § 841(b)(1)(A)(vi). Bacon admits that officers recovered 232 grams of fentanyl during the first search of his home, but he questions where the other 168 grams came from. Bacon forgets that officers searched his home a second time and found an additional 217 grams of fentanyl. The government's expert in forensic science and forensic chemistry testified that the mixtures from both searches contained fentanyl. This evidence allowed a rational jury to find that Bacon possessed at least 400 grams of fentanyl. Moreover, Bacon does not challenge the jury's finding that he also possessed 500 grams of meth. This finding independently supports Bacon's conviction on Count 1 and results in the same sentencing range, so any error with respect to the quantity of fentanyl was harmless. *See* 21 U.S.C. § 841(b)(1)(A)(viii).

AFFIRMED