In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 19-2316

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ELIJAH VINES,

*Defendant-Appellant.*

---

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:17-cr-00160-JRS-TAB-1 — **James R. Sweeney II**, *Judge.*

---

ARGUED OCTOBER 1, 2020 — DECIDED AUGUST 13, 2021

---

Before EASTERBROOK, MANION, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Following a jury trial, Elijah Vines was found guilty of five counts related to sex trafficking of a minor, including: sex trafficking of a child, in violation of 18 U.S.C. §§ 1591(a)(1), (b)(2), and (c); sex trafficking of a child, in violation of 18 U.S.C. §§ 1591(a)(2) and (b)(2); conspiracy to commit sex trafficking of a minor, in violation of 18 U.S.C. §§ 1594(c) and 1591; transportation of a minor, in violation of 18 U.S.C. § 2423(a); and interstate travel in aid of racketeering,

in violation of 18 U.S.C. § 1952(a)(3). He was sentenced to 480 months' imprisonment for Counts I-IV, and 60 months' imprisonment for Count V, to be served concurrently, placed under supervised release for life, and ordered to pay $13,500 in restitution to the victim ("GMC").

The evidence at trial demonstrated that GMC was a fifteen-year-old girl who ran away from her foster home in August 2016, and in September 2016 was arrested for shoplifting in Ohio. She did not provide her real name or age to police in order to avoid being returned to the foster system. She contacted a friend, Shayana, to pick her up from jail, and Shayana arrived accompanied by the defendant Elijah Vines. Vines was involved in criminal activity that included selling cellphones as part of a scam and prostituting females. He transported GMC to his residence and then to a hotel, and subsequently began prostituting GMC. To further those unlawful ends, he posted ads of GMC online, including on the website Backpage, which was a site commonly used to advertise prostitutes to customers. He also arranged for her to meet with those customers to engage in sex acts, and she gave the money paid for those acts to him. Vines was aware that GMC was a minor.

In October 2016, GMC was taken into custody as a runaway by law enforcement and was evaluated at the emergency room at Riley Children's Hospital in Indianapolis. She informed them that she had run away from home, and that she had been forced to engage in sex in exchange for drugs and money. An examination by doctors determined that she had injuries "too numerous to count."

Vines now appeals his convictions, arguing that the trial court erred in allowing the testimony of an expert witness that

related to the credibility of GMC; denying his motion to suppress GMC's identification of Vines through a Facebook photo; and denying the motions to suppress evidence obtained from a search of Vines's iPhone and from a search of his Facebook and iCloud accounts. We address these challenges in turn.

## I.

Vines first argues that the court erred in denying his motion in limine to exclude the testimony of the government expert witness, FBI Supervisory Special Agent Hardie, and allowing Hardie to testify at trial as a sex-trafficking expert. In his motion in limine, Vines argued that the expert testimony would address the behavior of victims of sex trafficking, including that they may not be completely forthcoming when questioned by law enforcement or medical personnel, and that such testimony was merely a means of improperly bolstering GMC's credibility. Vines argued that it is inappropriate for an expert witness to discuss another witness's credibility. The government responded that as a blind expert, Hardie would not have even spoken to GMC prior to the testimony or read any of her statements, and therefore his testimony could not possibly address GMC's credibility. It asserted that Hardie's testimony would be limited to the experience of sex-trafficking victims in general. The district court denied the motion in limine, and Hardie was permitted to testify at trial.

Federal Rule of Evidence 702 provides that:

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or

other specialized knowledge will help the trier
of fact to understand the evidence or to deter-
mine a fact in issue; (b) the testimony is based
on sufficient facts or data; (c) the testimony is
the product of reliable principles and methods;
and (d) the expert has reliably applied the prin-
ciples and methods to the facts of the case.

Vines alleges that the testimony of Hardie should have been
excluded because it exceeded the bounds of permissible ex-
pert testimony and addressed the credibility of the victim.
Where a defendant challenges the admission of expert testi-
mony, we review *de novo* whether the court applied the
proper Rule's framework, and review for abuse of discretion
the ultimate decision to admit. *United States v. Brown*, 973 F.3d
667, 703 (7th Cir. 2020). "A district court 'holds broad discre-
tion in its gatekeeper function of determining the relevance
and reliability of the expert opinion testimony.'" *Id.* (quoting
*Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 674 (7th Cir. 2017)).
Vines does not challenge the legal framework here, so we re-
view the admission of the testimony only for abuse of discre-
tion.

At trial, Hardie's testimony was limited to discussions of
the behavior of sex-trafficking victims in general. As to inves-
tigators, Hardie discussed the need to gain the trust of sex
trafficking victims, and the unwillingness of victims to reveal
all details from the start, as part of ongoing victim behavior.
Hardie made no reference to any actual behavior of GMC here
and presented no testimony as to her credibility.

Vines relies on *United States v. Benson*, 941 F.2d 598 (7th
Cir. 1991), to assert that such expert testimony was improp-
erly admitted, but the reasoning in *Benson* actually supports

the district court's admission of the evidence here. In *Benson*, Internal Revenue Agent Gary Cantzler provided expert testimony as to why Benson was required to file income tax returns in 1980 and 1981. *Id*. at 603. In stating his opinion, Cantzler relied upon the testimony of witnesses whose credibility had been attacked by Benson, thus making his own credibility determination. *Id*. at 604. He drew inferences from evidence that were not based on any special knowledge or skill, and for which he had no greater qualification than the jury. *Id*. In short, "Cantzler did not give helpful expert testimony that cast another witness' testimony in a good or bad light; instead, he simply told the jury whom to believe." *Id*. at 604–05. Accordingly, we held that the court abused its discretion in admitting much of the testimony of Cantzler. *Id*. at 605.

In contrast, Hardie's testimony in this case was based on his expertise as to sex trafficking which would benefit a jury in understanding the behavior of trafficking victims. It was not based on any assessment by Hardie as to the credibility of any witness, and did not include any opinion as to the credibility of any persons. Hardie merely provided insight as to sex trafficking generally and the effect on victims, which would aid a jury in understanding and evaluating the evidence presented to it. In fact, Hardie testified that he did not speak with GMC at any point in time and did not read any of her statements, and therefore his testimony could not have been interpreted as opining as to her credibility. Hardie's expert testimony, therefore, was the opposite of the expert opinion in *Benson*, in that Hardie merely provided expert testimony as to sex-trafficking victim behavior in general that could cast light on the testimony of other witnesses, but did not tell a jury whom to believe. Accordingly, Vines has failed to demon-

strate that the testimony of Hardie exceeded the scope of permissible testimony under Rule 702, and the district court did not abuse its discretion in allowing the testimony.

## II.

All of the remaining challenges by Vines pertain to the district court's denials of motions to suppress. Vines argues that the court erred in denying his motion to suppress: (1) GMC's identification of Vines in a photograph on a Facebook page; (2) the search of Vines's iPhone; and (3) the search of Vines's Facebook and iCloud accounts. We address these challenges in turn.

## A.

First, Vines challenges the district court's refusal to suppress GMC's identification of Vines from a photo on his Facebook page. We review a district court's denial of a motion to suppress an identification *de novo* with due deference to the district court's findings of historical fact. *United States v. Gonzalez*, 863 F.3d 576, 584 (7th Cir. 2017); *United States v. Harris*, 281 F.3d 667, 669–70 (7th Cir. 2002).

In the course of her third interview with investigating officers, GMC for the first time told them that her trafficker had a Facebook page under the name "Elijah Kilt Vines," which she sometimes saw when scrolling through his phone. Prior to that time, she told them that she called her trafficker "Deacon" or "Deacon Dollar," but that it was not his real name. In response to that information, the detectives then pulled up the Facebook page associated with "Elijah Kilt Vines" and asked "Is this him? I can't imagine there's another one with the same name like that." Dist. Ct. Order, Doc. 164 at 2, App. at A2. GMC then identified the photo on that page as depicting her

trafficker, Deacon. Vines contends that the identification procedure was an unduly suggestive presentation in violation of the Due Process Clause of the Constitution. Specifically, Vines asserts that law enforcement officials should have been aware that GMC had credibility problems, and that once GMC identified Vines as Deacon's alias, law enforcement erred in suggestively pulling up a single photo from that Facebook page rather than using a photo array including other individuals to obtain an identification.

In determining whether the Due Process Clause requires suppression of an eyewitness identification, the Supreme Court has articulated a two-step analysis. First, the Court has recognized that due process concerns arise only where the identification procedure employed was both suggestive and unnecessary. *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2559 (2018); *Perry v. New Hampshire*, 565 U.S. 228, 238 (2012). "To be 'impermissibly suggestive,' the procedure must 'give rise to a very substantial likelihood of irreparable misidentification.'" *Sexton*, 138 S. Ct. at 2559 (quoting *Neil v. Biggers*, 409 U.S. 188, 197 (1972) (additional internal quotation marks omitted)). Even in cases involving unnecessarily suggestive procedures, suppression of the resulting identification is not inevitable. *Id.*; *Perry*, 565 U.S. at 239. In such circumstances, the court must "assess, on a case-by-case basis, whether improper police conduct created a substantial likelihood of misidentification." *Sexton*, 138 S. Ct. at 2559 (internal quotations omitted) The linchpin of that assessment is the reliability of the eyewitness identification, and "[t]he factors affecting reliability include 'the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of cer-

tainty demonstrated at the confrontation, and the time be-
tween the crime and the confrontation.'" *Id.*, quoting *Manson
v. Brathwaite*, 432 U.S. 98, 114 (1977). Finally, due process is
implicated only where the process involved has the taint of
improper state conduct. *Perry*, 565 U.S. at 245. Where the sug-
gestive nature of an identification process is the result of cir-
cumstances unrelated to improper state conduct, due process
does not require the exclusion of the evidence. *Id.* at 233, 245;
*United States v. Sander*, 708 F.3d 976, 984 (7th Cir. 2013).

The Supreme Court has repeatedly recognized that the
manner in which the prosecution presents the suspect to a
witness for identification can introduce a degree of suggestion
into the identification process that inherently risks misidenti-
fication and a miscarriage of justice. See *Perry*, 565 U.S. at 243;
*United States v. Wade*, 388 U.S. 218, 228 (1967). Illustrating
some of the numerous methods of improper suggestion, the
Court "pointed to police-designed lineups where 'all in the
lineup but the suspect were known to the identifying witness,
… the other participants in [the] lineup were grossly dissimi-
lar in appearance to the suspect, … only the suspect was re-
quired to wear distinctive clothing which the culprit allegedly
wore, … the witness is told by the police that they have caught
the culprit after which the defendant is brought before the
witness alone or is viewed in jail, … the suspect is pointed out
before or during a lineup, [and] … the participants in the
lineup are asked to try on an article of clothing which fits only
the suspect.'" *Perry*, 565 U.S. at 243, quoting *Wade*, 388 U.S. at
233. In all of those situations, the circumstances of the identi-
fication utilized by the police steered the witness toward the
identification of a person that the police had singled out as a
suspect.

In contrast, Vines's challenge fails at the first step here, because he cannot demonstrate that the identification procedures used were "tainted by police arrangement." *Perry*, 565 U.S. at 238. This was not a case in which the government identified a suspect and then presented the person's photo to the victim in a manner impermissibly suggestive so as to give rise to a substantial likelihood of misidentification. In fact, there is no evidence that they had knowledge of what photos would be on the Facebook site, and whether those photos would relate at all to the description GMC provided of her trafficker. The detectives pulled up the Facebook page in response to GMC's statement that her trafficker had a Facebook account in that name to determine whether the Facebook account she referenced existed and to identify it. Vines has presented no evidence whatsoever to indicate that the detectives orchestrated the display of the Facebook page in order to facilitate the identification of a particular person known to the detectives at the time. Because the existence of the Facebook page was raised by GMC and the detectives had no apparent prior knowledge of it, the display of the photo on the Facebook page lacked the context of government involvement or any government suspicion of guilt that is found in the examples of suggestive identification arrangements. See *Perry*, 565 U.S. at 232 ("a due process check on the admission of eyewitness identification [is] applicable when the police have arranged suggestive circumstances leading the witness to identify a particular person as the perpetrator of a crime."); *Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 347 (7th Cir. 2019) ("Due Process Clause requires the exclusion of an eyewitness identification if the unduly suggestive circumstances are so egregious as to taint the entire trial"). There is, in short, no basis to hold that the showing of the Facebook account to GMC was

"suggestive." This case instead is analogous to that presented in *Perry*, in which the witness identified a person based on the witness's own initiative rather than based on a police-generated identification arrangement. Although the due process claim would have faltered on other grounds as well—including on the reliability element, given that GMC had ample opportunity to observe her trafficker and had in fact identified him by name prior to being shown the photo—we need not explore that element because the taint of improper police conduct is not present here.

## B.

Vines next challenges the district court's denial of the motion to suppress regarding the search of his iPhone. For denials of motions to suppress, we review conclusions of law *de novo*, and review findings of fact for clear error. *United States v. Edgeworth*, 889 F.3d 350, 353 (7th Cir. 2018).

In interviews with law enforcement, GMC stated that Vines used his cell phone to record her performing sex acts on him, and to photograph her and share those photos with potential clients through a sex-trafficking website and a messaging application. Dist. Ct. Order, Doc. 164 at 6, App. at A6. When Vines was taken into federal custody on July 14, 2017, he gave his iPhone to his girlfriend, Sajal Smoote, who thereafter kept the phone at her home. Smoote did not know the password to access the phone. In mid-August 2017, law enforcement officers visited Smoote at her home and asked her if she still had Vines's phone and if she would provide it to them. They informed her that they would seek a search warrant if she did not provide the phone to them. Smoote gave

the phone to them, and law enforcement officials subsequently obtained a search warrant to access the contents of the phone.

Although purporting to challenge the "search" of the phone, Vines does not challenge the validity of the warrant that authorized the actual search, and his arguments instead relate only to the lawfulness of the initial seizure of the phone. As to that, he argues that the seizure of the phone was unlawful because Smoote did not have the passcode to the phone, and because her consent was invalid.

Vines conflates the seizure of the phone and the search of its contents in his arguments. He argues that a person in possession of a locked or sealed item does not have a possessory interest in such item, and that Smoote lacked a possessory interest in the phone because she did not know the passcode for it. He also asserts that at the time Smoote provided the phone to law enforcement, a reasonable person would have known that the police would have attempted to search the phone, and therefore her surrender of the phone to them was "tantamount to consent to search the phone." Vines's cases in support of those arguments, however, address the search of the contents of locked containers, not the seizure of such containers. Because the search of the phone's contents in this case was done pursuant to a warrant—which is unchallenged here—those cases are inapplicable to the situation in this case.

Instead, our decision in *United States v. James*, 571 F.3d 707 (7th Cir. 2009), is controlling. In that case, James had left a locked safe at the residence of his mother, Linda Martin. Martin was interviewed by detectives investigating James's involvement in some bank robberies. Martin subsequently called those detectives and told them that James had informed

her that the safe contained a gun. *Id*. at 711. Martin told them she was not going to open the safe before police came to the residence. *Id*. The detectives then contacted her and told her they would like to assist her with turning the gun over to the police. When they came to the residence, she showed them the safe and made no objection to their plan to remove it from the residence. *Id*. They subsequently obtained a warrant to search the contents of the safe.

James sought to suppress the items found in the safe, arguing they were obtained in violation of his Fourth Amendment rights. We upheld the district court's denial of that motion to suppress. We recognized that James held two interests protected by the Fourth Amendment that were implicated—the privacy interest in the contents of the safe, which was not at issue because a search warrant was obtained before opening and searching the safe, and a right to possess the safe, which was implicated by the initial seizure of the safe from Martin. *Id*. at 713. Although typically a seizure of property is unreasonable under the Fourth Amendment unless pursuant to a warrant, we held that third-party consent was a well-established exception to the warrant requirement. *Id*. We noted that "where a defendant allows a third party to exercise actual or apparent authority over the defendant's property, he is considered to have assumed the risk that the third party might permit access to others, including government agents." *Id*. at 713–14. We concluded that authority to consent to the initial seizure would be shown if Martin: "(1) had joint control of or access to the safe itself (regardless of whether she had access to the contents of the safe) (actual authority); or (2) it was reasonable for police to believe she had joint control of or access to the safe itself (apparent authority)." *Id*. at 714. We

determined that both actual and apparent authority were established. As demonstrating actual authority, we noted that the safe was in the house because James had left it with Martin, that Martin possessed it for a significant period of time, and that Martin exercised control over the safe itself and James did not limit or restrict her control over the safe. *Id*. Furthermore, we held that Martin's acquiescence to the removal of the safe by the detectives from her home constituted consent even without any formal statement of consent. We noted that consent can be express or implied from circumstances, and can be verbal or non-verbal. *Id*. at 715.

Similarly, Vines possessed two protectible interests here: the privacy interest in the contents of the phone, which was not at issue because a search warrant was obtained before opening and searching the phone, and a right to possess the phone, which was implicated in the initial seizure of the phone from Smoote. As in *James*, a warrant was unnecessary to seize the phone, even though it impacted his possessory interest in it, because the third-party consent exception to the warrant requirement applies. Smoote possessed actual (and apparent, although we need not explore that) authority over the phone itself. Similar to the safe in *James*, the phone was left in her possession for at least a month, and Vines did not limit or restrict her control over it. She therefore was able to consent to the seizure of the phone, and the court did not err in determining that she did so. Vines argues that consent was coerced because the officers informed Smoote that they would return after obtaining a warrant if she did not consent, but nothing in that colloquy renders the acquiescence involuntary. In fact, informing her that they would need to return with a warrant in order to seize the phone if she did not consent made clear that she had the right to refuse to turn it over. Vines has raised

no meritorious challenge to the seizure of the phone, and the court did not err in denying the motion to suppress its contents.

## C.

Finally, Vines challenges the district court's denial of his motion to suppress the results of the search of his Facebook and iCloud accounts. According to Vines, the warrant application, in its recitation of statements by GMC, contained a large number of misrepresentations and contradictions. He argues that the government omitted or misrepresented information material to GMC's credibility which was sufficient to raise an inference of reckless disregard, and that the district court should have conducted an evidentiary hearing as recognized in *Franks v. Delaware*, 438 U.S. 154 (1978), to assess the validity of the warrant in light of those misrepresentations and omissions.

The Fourth Amendment of the Constitution commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." That probable cause determination is a "practical, common-sense" one based upon the totality of the circumstances, and exists for a search warrant when those circumstances indicate even a fair probability that contraband or evidence of a crime will be found in a particular location. *United States v. Bacon*, 991 F.3d 835, 839 (7th Cir. 2021) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)); *United States v. Adams*, 934 F.3d 720, 725 (7th Cir. 2019). That showing requires neither absolute certainty nor even a preponderance of the evidence. *Adams*, 934 F.3d at 725.

The Supreme Court in *Franks*, 438 U.S. 154, recognized that a defendant may challenge the truthfulness of statements made in the affidavit seeking the search warrant. A search warrant may be invalid if the police obtain it by deliberately or recklessly providing false, material information or deceptive omissions to the issuing judge. *Bacon*, 991 F.3d at 841; *United States v. Hansmeier*, 867 F.3d 807, 813 (7th Cir. 2017). A defendant is entitled to an evidentiary hearing (a "*Franks* hearing") if he makes a substantial preliminary showing of specific intentional or reckless misrepresentations or omissions. *United States v. Santiago*, 905 F.3d 1013, 1025 (7th Cir. 2018); *United States v. Clark*, 935 F.3d 558, 563 (7th Cir. 2019). However, to obtain a *Franks* hearing, "the defendant must also show that if the deliberately or recklessly false statements were omitted, or if the deliberately or recklessly misleading omissions included, probable cause would have been absent." *Santiago*, 905 F.3d at 1025 (quoting *United States v. McMurtrey*, 704 F.3d 502, 509 (7th Cir. 2013)). "[I]f probable cause to issue the warrant would still exist even if the false statement or material omission were corrected, then no *Franks* hearing is required." *Id.* (quoting *United States v. Carmel*, 548 F.3d 571, 577 (7th Cir. 2008)); *United States v. Mullins*, 803 F.3d 858, 862 (7th Cir. 2015) (courts "consider the affidavit, eliminating any false statements and incorporating omitted material facts, and determine [ ] whether probable cause existed")(internal quotation marks omitted); see also *Clark*, 935 F.3d at 563 (to obtain a *Franks* hearing, a defendant must make a substantial preliminary showing that the material falsity or omission would alter the judge's probable cause determination). A denial of a *Franks* hearing is reviewed only for clear error, and a district court's legal conclusions are reviewed *de novo*. *Bacon*, 991 F.3d at 841.

In this appeal, Vines recounts a laundry list of the alleged misrepresentations and omissions in the affidavit that he argues would have caused the district court to question GMC's credibility. These include a number of alleged contradictions by GMC in her recounting of events and her responses to questions over time. The link between the allegations and GMC's credibility is a tenuous one for many of the allegations. For instance, at least some of those alleged contradictions by Vines are "internal contradictions"—statements within the affidavit which contradict each other. Vines does not explain how those statements could invalidate the warrant, given that the issuing judge would have therefore been aware of the contradictions and could factor it into the assessment of credibility. See *Bacon*, 991 F.3d at 841 (holding that omissions were immaterial because they were apparent from the face of the affidavit). Other representations or omissions alleged by Vines would not, on their face, impact credibility in any meaningful manner.

But we need not engage in an analysis of each alleged misrepresentation or omission, because the district court's decision rested on another ground that is unchallenged by Vines. Vines's argument in favor of a *Franks* hearing is that the misrepresentations and omissions could have impacted the court's credibility assessment of GMC, but such a showing is not sufficient to require a *Franks* hearing. Vines must also demonstrate that absent the omission or misrepresentation, probable cause would not exist. For instance, even in the context of warrants based on statements from informants, in which the informant's credibility is crucial, we have repeatedly recognized that misrepresentations or omissions that could impact the credibility assessment do not trigger a *Franks* hearing where probable cause is nevertheless established

through other evidence. See *Santiago*, 905 F.3d at 1025 (upholding the denial of a *Franks* hearing where the omission would not have altered the court's probable cause conclusion because the affidavit was replete with evidence that the target phones were used to coordinate ongoing drug transactions and that the tapping of the phones would lead to further evidence of criminal activity), *United States v. Musgraves*, 831 F.3d 454, 461 n.1 (7th Cir. 2016) (holding that the omission of information about an informant's criminal background did not undermine probable cause and require a *Franks* hearing in light of the statements from another witness and a video recording that corroborated the informant's account of a controlled buy a year earlier), and *Mullins*, 803 F.3d at 862 (7th Cir. 2015) (*Franks* hearing not required because even eliminating any false statements and incorporating omissions, probable cause existed given the level of detail in the statements and the corroborating evidence); see also *United States v. Taylor*, 471 F.3d 832, 840 (7th Cir. 2006)(after a *Franks* hearing, holding that the omission of an informant's criminal background and financial motive was not essential to the probable cause determination where the detailed affidavit had been extensively corroborated). A *Franks* hearing is not required where independent evidence of corroboration or other evidence unrelated to the challenged evidence is sufficient to support probable cause.

That is precisely what the district court found here. The court held that even assuming that the challenged omissions could have impacted its credibility determination, other evidence established probable cause (MV1 refers to GMC):

> [A]s submitted, the affidavits are detailed and include extensive information corroborating MV1's statements. Investigators corroborated

through Backpage that there were, consistent with MV1's statements, postings to Backpage advertising MV1 under the names "Halle" and "Violet." MV1's involvement in prostitution with Vines was corroborated by Witness S.P.'s statement, which was itself corroborated by the police report resulting from Witness S.P.'s call to police. Other aspects of MV1's statements and Witness S.P.'s statement were corroborated by the registries of hotels that MV1 and Witness S.P. specifically mentioned. MV1's statements about A.D., including that MV1 and A.D. were advertised on Backpage for "two girl specials," were corroborated by A.D.'s statement. Baker's involvement with MV1 and A.D. was corroborated by the circumstances of A.D.'s and Baker's arrests as well as by Witness S.P.'s statement. Given the affidavits' level of detail and corroboration, there would have been probable cause for search of Vines's Facebook and iCloud accounts even if the alleged omissions had been fully disclosed in the warrant applications.

(internal citations omitted) Dist. Ct. Order, Appx. at A10–11.

Vines does not address that holding. He argues extensively that the alleged misrepresentations and omissions could have impacted GMC's credibility, but never acknowledges or addresses the court's holding that probable cause was nonetheless established by that other evidence not impacted by those statements and omissions.

The government in its responsive brief addressed that holding by the district court, as well as additional corroborating evidence unrelated to GMC's statements, and argued that any impact on GMC's credibility from the alleged misrepresentations or omissions would not therefore undermine the probable cause determination. In the reply brief, however, Vines once again does not acknowledge or address the evidence identified by the district court, nor the court's conclusion that the evidence would establish probable cause even if the challenged evidence was corrected. Vines instead merely declares in a conclusory statement that the misrepresentations and omissions were "material." That is insufficient to preserve a challenge to the district court's holding. The district court identified significant evidence independent of GMC's statements that established probable cause, and we will not manufacture challenges to that determination that are not raised by Vines. *Hackett v. City of S. Bend*, 956 F.3d 504, 510 (7th Cir. 2020) ("[a]n appellant who does not address the rulings and reasoning of the district court forfeits any arguments he might have that those rulings were wrong"); *Griffin v. Bell*, 694 F.3d 817, 826 (7th Cir. 2012) (holding that the plaintiff's failure to challenge the district court's alternate basis for its holding was fatal to the claim of error). Therefore, even assuming that the alleged misrepresentations and omissions could have undermined GMC's credibility, the unchallenged holding of the district court that probable cause was nevertheless established by other evidence forecloses Vines's arguments that a *Franks* hearing was required and that the motion to suppress should have been granted.

### III.

Because the above arguments are unavailing, and Vines has raised no other meritorious challenge, the decision of the district court is AFFIRMED.